USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 24, 2010

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

MICHAEL F. ARMSTRONG, as Receiver for   :
Ashbury Capital Partners, L.P., Ashbury Capital   :
Management, L.L.C., Apex Investments, and the   :
assets of Mark Yagalla,   :
  :
                  Plaintiff,   :     01 Civ. 2437 (PAC)
  :
        - against -   :     <u>MEMORANDUM</u>
  :     <u>OPINION & ORDER</u>
RONALD COLLINS, LORRAINE COLLINS,   :
CAROLYN EGAN, ANDREW COLLINS,   :
DANIEL E. COLLINS, LISA A. CIACH, and   :
COLLINS CHIROPRACTIC,   :
  :
             Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

MICHAEL F. ARMSTRONG, as Receiver for   :
Ashbury Capital Partners, L.P., Ashbury Capital   :
Management, L.L.C., Apex Investments, and the   :
assets of Mark Yagalla,   :
  :
                  Plaintiff,   :     02 Civ. 2796 (PAC)
  :
        - against -   :
  :
MARIO A. ROMANO and ROMANO   :
ENTERPRISES LIMITED, LTD.   :
             Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

MICHAEL F. ARMSTRONG, as Receiver for   :
Ashbury Capital Partners, L.P., Ashbury Capital   :
Management, L.L.C., Apex Investments, and the   :
assets of Mark Yagalla,   :
  :
                  Plaintiff,   :     02 Civ. 3620 (PAC)
  :
        - against -   :
  :
MICHELLE BRAUN a/k/a NICI a/k/a   :
MICHELLE L. FIORAVANTI, NICI, INC.,   :
NICI ENTERTAINMENT GROUP, L.L.C.,   :

Collectively d/b/a NICI'S WORLD, NICI'S GIRLS :
and NYC FANTASIES                                    :
                                    Defendants.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

HONORABLE PAUL A. CROTTY, United States District Judge:

From 1995 through 2000, Mark Yagalla ("Yagalla") defrauded investors out of tens of millions of dollars.  The fraud was ultimately discovered in October, 2000, but by then Yagalla had dissipated essentially all of the money he stole.  After his arrest, the Securities and Exchange Commission ("SEC") commenced an enforcement action against Yagalla and the companies he controlled.  <u>SEC v. Ashbury Capital Partners, L.P. et al.</u>, No. 00 Civ. 7898 (the "<u>SEC</u> Action").  The Court appointed Michael F. Armstrong as receiver (the "Receiver") for Yagalla's assets and the companies utilized in perpetrating the fraud.  The Receiver commenced these three actions to recover funds transferred to various defendants by Yagalla during the course of his fraudulent scheme: <u>Armstrong v. Ronald Collins, et al.</u>, No. 01 Civ. 2437 (the "<u>Collins</u> Action"); <u>Armstrong v. Michelle Braun, et al.</u>, No. 02 Civ. 3620 (the "<u>Braun</u> Action"); and <u>Armstrong v. Michael A. Romano, et al.</u>, No. 02 Civ. 2796 (the "<u>Romano</u> Action").[1]

There are five motions for summary judgment pending.  In the <u>Collins</u> Action, the Receiver and the Defendants both move for partial summary judgment.  For the reasons that follow, the Receiver's motion is granted in part and denied in part and the Defendants' motion is denied.  In the <u>Braun</u> action the Receiver moves for partial summary judgment and the Defendants move for summary judgment.  For the reasons that follow, the Receiver's motion is granted in part and denied in part and the

_____

[1] The <u>SEC</u> Action and the <u>Collins</u>, <u>Braun</u> and <u>Romano</u> Actions were initially assigned to Judge Richard Casey.  After his passing, the cases were transferred to Judge Laura Swain.  On June 5, 2009, the cases were transferred to the undersigned's docket.

Defendants motion is denied.  The Receiver moves for partial summary judgment in the

<u>Romano</u> Action, and for the reasons that follow, the motion is granted in part and denied

in part.

## BACKGROUND

**I. Facts**

**A. History of the Yagalla Scheme**

While most other children were dreaming of becoming firemen, doctors and

baseball players, at the age of thirteen Yagalla knew he wanted to be a Wall Street

investor.  Yagalla made his first investment through an account opened with his mother

when he was still a minor, but the stock he purchased lost money.  (December, 2002,

Deposition of Mark Yagalla ("Yagalla Dep. II"), at 133.)   In the fall of 1994, when he

was a high school student in Weatherly, Pennsylvania, Yagalla decided that he wanted to

invest money for other people and believed he needed a "name" to trade under.  (<u>Id.</u> at

135.)[2]   Yagalla filed a fictitious name certificate for the name Apex Investments

("Apex") with the Commonwealth of Pennsylvania and began soliciting funds.  (<u>Id.</u> at

215.)

Carl and Pat Dias, the owners of a business near Weatherly, had the misfortune of

being Yagalla's first clients, and in 1995, they invested approximately $15,000 with

Yagalla.  (Yagalla Dep. I at 39-40.)  Responding to a Canadian telemarketer's pitch,

Yagalla used the money to purchase what he believed were rubies.  (<u>Id.</u>; Yagalla Dep. II

at 135.)  But the purported rubies turned out to be nearly worthless and Yagalla lost

---

[2] After graduating high school in 1995, Yagalla attended the University of Kentucky for a semester and
then transferred to the University of Pennsylvania where he was enrolled as an undergraduate for three
semesters.  (July, 2002, Deposition of Mark Yagalla ("Yagalla Dep. I") at 732-33; Yagalla Dep. II at 133-
34.)

virtually all of the Dias' money.  (Yagalla Dep. I at 40.)  Yagalla, however, told the

Diases that they had made a profit and sent them a false statement.  (Id.; Yagalla Dep. II

at 139.)  Despite the loss, after raising money from additional investors, Yagalla made a

distribution to the Diases in excess of their investment.  (Yagalla Dep. I at 41.)

In 1995, Yagalla also solicited a $15,000 investment from his cousin, Francis

Dolinsky.  (Id.)  Yagalla deposited the money in his deposit account, and then used it to

purchase baseball memorabilia and more purported rubies.  (Id.)  While the "rubies"

turned out to be worth pennies on the dollar, and the baseball memorabilia was worthless,

Yagalla told Dolinsky that he had made a profit.  (Id. at 41-42.)  As with the Diases,

Yagalla ultimately made a distribution to Dolinsky funded by money he raised from other

investors.  (Id. at 42.)

Later in 1995 and in 1996, Yagalla raised more funds from other investors.  (Id.)

His next investment, $50,000 in Kentucky oil and gas leases, was a complete failure.

(Id.)  Yagalla then invested $23,000 in stock purchased through a broker at Kensington

Wells; this investment turned a profit of approximately $9,000.  (Id. at 42-43.)  Shortly

thereafter, however, Yagalla made a $150,000 stock investment and suffered a loss of

$120,000.  (Id.)  During this time, Yagalla sent his investors statements falsely indicating

that they had earned handsome profits and made distributions "[w]ith money from other

investors."  (Yagalla Dep. I at 26-27, 43, 223.)

Since "the perception of Apex was so different [from reality]," Yagalla formed a

hedge fund to raise money from additional investors in 1998.  (Yagalla Dep. II at 192;

Yagalla Dep. I at 13.)  With the assistance of counsel, Yagalla organized the limited

partnership Ashbury Capital Partners, L.P. ("Ashbury"), with Ashbury Capital

Management, L.L.C. ("ACM") as its general partner.  (Yagalla Dep. I. at 13, 35-36.)

Yagalla owned 99% of ACM, and the other 1% was first owned by his secretary,

Kimberly Lawrence, and later by his "business partner," Robert Smith.  (Id. at 13.)

Yagalla explained that he initially intended to run Ashbury legitimately and to separate it

from Apex.  (Yagalla Dep. II at 192, 224.)  But despite Yagalla's professed intention to

run Ashbury as a legitimate hedge fund, Yagalla explained that because he needed money

to perpetuate the fraud at Apex, he instead "used it for unlawful purposes."   (Yagalla

Dep. I at 36; Yagalla Dep. II at 224-25.)  After he created Ashbury, most of the new

investors Yagalla solicited became limited partners in Ashbury, though some invested in

Apex.  Yagalla, however, made no effort to segregate the investors' funds.  (Yagalla Dep.

I at 15.)  Instead, he commingled the funds invested in Apex and Ashbury together and

with his personal funds.  (Id.)

    At some point, Yagalla learned that the brokerage firm Kensington Wells was

manipulating stocks.  (Yagalla Dep. I at 44-45; Yagalla Dep. II at 157-58.)  Yagalla

decided to use the funds he had raised to make a profit on manipulated stock.  (Yagalla

Dep. I at 44-45.)  After meeting the individuals he was told were manipulating stock, and

until his arrest in October, 2000, other than some sporadic and minor day trading, Yagalla

traded exclusively in stocks that he testified were manipulated.  (Yagalla Dep. I at 44-54,

57-58.)  The manipulated stocks included: United Energy Group, Franklin Opthalmic,

Delsoft Consulting, Logpoint Technologies, Page International, Hydrogiene, Intelliworxx

and TravelNow.com.  (Id.)  Yagalla explained that in each case he and his criminal

partners would identify new private companies, merge them with public shells, and by

controlling the float and paying off brokers, manipulate the price of the securities.  (Id. at

47-48.)  According to Yagalla, he broke even on the United Energy Group and Franklin Opthalmic manipulations; made $500,000 on the Delsoft Consulting manipulation; made $250,000 on the Logpoint Technologies manipulation; lost $750,000 on the Page International manipulation; made $450,000 on the Hydrogiene manipulation; and lost a "substantial amount" of the $500,000 to $750,000 he invested in the Interlliworxx manipulation.  (Id. at 45-54.)  On his most profitable manipulation, TravelNow.com ("TravelNow"), Yagalla made over $6 million between August, 1999, and January, 2000.  (Id. at 55.)  Yagalla, however, spent the money "[o]n airplane travel, . . . [his] former girlfriend Sandra Bently, jewelry, cars, houses, [and] gambling."  (Id.)

Between 1998 and his arrest in October, 2000, Yagalla made direct investments in various business ventures, including a retirement home, a limousine service and other private companies.  (Affidavit of Eugene R. Licker dated Sept. 29, 2004 ("Licker Aff. 9/29/2004") ¶ 8.)  All of these investments lost money.  (Id.)  Throughout this time, however, Yagalla made distributions to investors "from the profits of th[e] manipulated [stock] deals and from raising money from additional investors or existing investors."  (Yagalla Dep. I at 56.)

Yagalla subsidized his profligate lifestyle with his investors' money.  He spent millions of dollars gambling at casinos, traveling on private jets, and on clothes, luxury cars and houses.  (Id. at 65-103.)  He leased, but never used, offices on New York's Park Avenue and in Boston.  (Id. at 110-11.)   He put a $1 million deposit on a $10 million Manhattan condominium.  (Id. at 94-95.)  Yagalla also spent untold sums of investors' money on high-priced prostitutes and women he met at strip clubs.  (Id. at 65.)  Yagalla testified that he placed some of the women he met through escort services and at strip

clubs on, what he called, "the program."  (Id.)  Women on "the program" would receive

monthly allowances (sometimes over $20,000) use of a credit card, and extravagant gifts.

(Id. at 65-103.)  Yagalla also gave some of the women expensive cars and a luxury home

to live in.  (Id.)

**B. Criminal and Enforcement Actions and Appointment of the Receiver**

On October 13, 2000, Yagalla confided in a co-worker that he was operating a

Ponzi scheme.  (Yagalla Dep. I. at 638.)  The co-worker went to the authorities. (Id. at

639.) Shortly after the authorities were notified, the United State's Attorney's Office filed

an information (the "Information") against Yagalla charging him with one count of

securities fraud and one count of fraud under the Investment Advisers Act.  (Information,

Licker Aff. 9/29/04, Ex. 32.)

On October 17, 2000, the SEC brought an enforcement action against Yagalla,

Ashbury and ACM.  (SEC Action Complaint, Licker Aff. 4/29/2004, Ex. 35.)  The SEC

alleged, among other things, that Yagalla and the entities he controlled engaged in an

ongoing fraud in which they misappropriated investors' funds and disseminated false

accounting statements and newsletters.  (Id.)  On October 18, 2000, a day after the SEC

filed its enforcement action, Yagalla was arrested.  (Licker Aff. 4/3/2009 ¶ 13.)

On October 27, 2000, the Court granted the SEC's request for a preliminary

injunction freezing Yagalla's, Ashbury's and ACM's assets.  (Preliminary Injunction and

Order Freezing Assets and Granting Other Relief, Licker Aff. 4/3/2009, Ex. 36.)

Yagalla, and the entities he controlled, consented to the imposition of a preliminary

injunction and have not responded to the SEC's complaint or denied the SEC's

allegations.  (Id.; Licker Aff. 4/25/2003 ¶ 3.)  On November 9, 2000, the Court appointed

Armstrong as the Receiver charged with identifying, marshalling and preserving the assets of Ashbury, ACM, Apex and Yagalla.  (Restated and Amended Order Appointing Receiver and Granting Other Relief, Licker Aff. 9/29/2004, Ex. 37.)

On November 12, 2001, Yagalla pled guilty to count one of the Information charging fraud in connection with the purchase and sale of securities.  (Yagalla Plea Hearing Tr., Licker Aff. 4/25/2003, Ex. N.)  On February 14, 2002, Judge Stein sentenced Yagalla to 65 months' imprisonment and ordered Yagalla to make restitution of approximately $32,000,000 to the investors he defrauded.  (Yagalla Sentencing Tr., Licker Aff. 9/25//2004, Ex. 34.)

From 1995 through his arrest in October, 2000, Yagalla solicited approximately $50 million from investors.  (Yagalla Dep. II at 238.)  By the time of his arrest Yagalla had, for all practical purposes, dissipated all of the investor's funds.  (Licker Aff. 9/29/2004 ¶ 7.)

Set forth below is an overview of the facts and transactions relevant to the motions pending in the <u>Braun</u>, <u>Romano</u> and <u>Collins</u> Actions.  The Receiver's primary claims are based on various transfers Yagalla made to the Defendants.  He contends that the transfers were fraudulent and should therefore be voided.

**C. Braun**

In 1998, Yagalla visited a website operated by Michelle Braun ("Braun") called Nici's Girls.  (Yagalla Dep. II. at 11.)  According to Braun, Nici's Girls is an escort service that generates revenue by introducing "female companions to male clients." (Deposition of Michelle Braun ("Braun Dep.") at 10.)  The female companions "escort

[men] to functions or travel."  (Id.)[3]  While the Receiver requested that Braun produce

printouts of the website as it existed in 1998, Braun explained that there are no records of

the website's content prior to 2002.  (Braun Dep. at 275.)  As of 2003, however, the

website contained the following statement:

> An evening consultation is a minimum of five hours and rates begin at
> $8,000.  There are no geographical limitations . . . Travel rates begin at
> $10,000 per day.  All inclusive travel packages can be arranged through
> Luxury Concierge, rates begin at $12,000 per day.  Hourly consultations
> begin at $2,500 . . . Supermodel package rates range from $15,000 to more
> than $50,000 for an evening of undiluted pleasure, where your ultimate
> dreams become the ultimate reality!

(Printout of www.nicisgirls.com, as of April 23, 2003, Licker Aff. 4/25/2003, Ex. B.)

Braun testified that the standard rate for dates arranged through Nici's Girls ranges from

$8,000 to $15,000.  (Braun Dep. at 16-17.)

After visiting the Nici's Girls website, Yagalla sent an email to Braun stating that

he was "interested in seeing one of her girls."  (Yagalla Dep. II at 13.)  Yagalla believed

that he would be hiring a prostitute from Braun, but when Yagalla called Braun shortly

after sending the email, he claims the two discussed "fun," not sex.  (Id. at 14-15.)  In

early 1999, Yagalla began employing Braun's services; and over the next seven to eight

months, he hired at least seven different escorts from Braun, each time paying Braun a

substantial fee.  (Braun Dep. at 129-131; Braun Admissions ¶ 11.)  Though there is some

dispute as to the exact figure, Yagalla paid Braun approximately $126,000 for the time he

spent with the seven women.  (Braun Admissions ¶¶ 11-13, 16-17, 19-20; Braun Dep. at

146-47, 151-52, 171-72; Yagalla Dep. II at 16-18, 53-58, 60-69.)  Yagalla claims that he

---

[3] As of 2003, Nici's Girls was owned and operated by Nici, Inc., which is a California corporation wholly owned by Braun.  (Braun Defendants' Responses to Receiver's First Set of Requests for Admissions ("Braun Admissions") ¶¶ 1-7, Affidavit of Eugene Licker dated April 25, 2003 ("Licker Aff. 4/25/2003"), Ex. D.)

had sex with most, but not all, of the women he paid Braun to meet.  (Yagalla Dep. II at 58, 66, 71).  Yagalla testified that during the course of his relationship with Braun, he told Braun that he had sex with two of the women she arranged for him to meet.  (Yagalla Dep. II at 26-27.)  But Yagalla never spoke with Braun about whether he would have sex with an escort prior to the date; according to Yagalla, the discussions regarding sex were "reporting after the fact."  (Id. at 27.)  Braun denies that she ever spoke with any customer of Nici's Girls about sexual services.  (Braun Dep. at 22.)

Faith Jones Maxwell ("Maxwell"), a women who worked for Braun and who Braun introduced to Yagalla for $16,000, testified that she had sex with Yagalla on one of their dates.  (Deposition of Faith Jones Maxwell ("Maxwell Dep.") at 35.)  Maxwell stated that it was in her discretion whether to have sex with the men she met through Braun, (Maxwell Dep. at 35), but also that "sometimes" her "duties" included having sex.  (Id.)  Maxwell testified that she had sex with "most" of the "men that Michelle Braun arranged escorts" and that she spoke with Braun about having sex with at least some of the men.  (Id. at 36.)  Notwithstanding the obvious nature of the enterprise, Braun claims that the escorts who work for Nici's Girls do not provide sexual services.  She insists that she does not "ask that of them.  I don't tell them to."  (Braun Dep. at 21.)  Further, according to Braun, if a customer asks about sexual relations with an escort, Braun asserts that "[w]e don't provide sexual services."  (Id. at 22-23.)

Braun testified that Yagalla agreed to pay the standard introduction fee for each escort he hired through Nici's Girls.  There was another "service" that Braun offered to the very rich, lonely heart:

> if he met somebody he liked and wanted to see her again rather than to pay
> me which was standard practice in my business he would pay me a one

> time fee and that girl would no longer work through me or be available to
> my other clients, that she would be his girlfriend exclusively and I would
> no longer have any contact with her and he would pay me a lump sum fee.

(Braun Dep. at 133-34.)  According to Braun, the "lump sum fee" Yagalla agreed to pay

for a "girlfriend" was $500,000.  (Id. at 134.)

In August, 1999, Braun introduced Yagalla to Tishira Cousino ("Cousino").

(Yagalla Dep. II at 70-71.)  According to Braun, this introduction lead to Cousino

becoming Yagalla's "girlfriend,"[4] and because Braun stopped making arrangements – at

least temporarily – for Cousino to see other customers, Braun became entitled to the

$500,000 Yagalla had agreed to pay.  (Braun Dep. at 138-44, 148.)   Yagalla admitted

during his deposition that Braun told him that she expected to be paid $250,000 to

$500,000 if she found him a "girlfriend."  (Yagalla Dep. at 80.)  Yagalla, however,

testified that he did not intend to pay Braun because he felt that "he didn't owe her

anything."  (Id. at 77, 79.)  Nevertheless, according to Yagalla, when Braun "basically

blackmailed" him for the money by harassing Cousino, he paid Braun a total of $250,000

through two transfers in August and September, 1999.  (Braun Admissions ¶¶ 27-28.)

While Braun maintains that the $250,000 was in consideration for her agreement not to

schedule dates for Cousino with other men, and for finding Yagalla a "girlfriend,"

Yagalla sent Braun a letter (the "Gift Letter") on September 30, 1999, confirming that he

had given Braun a gift of $250,000.  (Braun Admissions ¶¶ 32-33.)  And rather than

treating the $250,000 as income, Braun claimed the $250,000 as a gift for federal income

tax purposes.  (Id. at 31.)

---

[4] Yagalla never had sexual relations with Cousino.  (Yagalla Dep. II at 71, 85-86.)  According to Yagalla, he "wanted to get to know her [Cousino] first."  (Id. at 71.)

Yagalla testified that in addition to the $126,000 he paid for escorts, and the $250,000 he paid "for" Cousino, between March, 1999 and April, 2000, he sent Braun between $180,000 and $360,000 in cash, cashiers checks and bank checks through nine Federal Express shipments.  (Yagalla Dep. II at 116, 121-23; Federal Express Documents, Affidavit of Eugene R. Licker dated May 23, 2003 ("Licker Aff. 5/23/2003"), Ex. R.)  Yagalla also says that at some point in 1999, he transferred 10,000 shares of Intelliworxx stock to Braun.  (Yagalla Dep. II. at 77.)  And there is evidence that on June 10, 1999, Yagalla faxed his brokers with instructions to transfer 10,000 shares of Intelliworxx to Braun.  (Fax Cover Sheet, Licker Aff. 5/23/03, Ex. P.) According to Yagalla, the stock was worth $100,000 at the time of the transfer, but he admits that he was manipulating the stock's price.  (Yagalla Dep. I at 54.)

In the spring of 1999, Yagalla and Braun discussed going into the internet pornography business together.  (Yagalla Dep. II at 91-92; Braun Dep. at 177-78.)  The two reached an oral agreement to operate an adult membership website called "Nici's World," where subscribers would be able to view adult photos and videos for a $29.95 monthly fee.  (Yagalla Dep. II at 93-95; Braun Dep. at 179-82.)  Yagalla and Braun were to be equal partners in the venture, with Yagalla providing the capital and Braun providing the "sweat equity."  (Yagalla Dep. II at 93-95; Braun Dep. at 184.)  Braun was to "run the operation" and "provided the know how and the expertise on . . . [the internet pornography] industry."  (Yagalla Dep. II. at 93-94.)  According to Yagalla, he and Braun intended to use a domain name Braun owned, www.nicisworld.com, to run the website.  (Id. at 94-95.)  Yagalla testified that Braun told him that the venture would require about $250,000 and that he "agreed to put up the first [$]50,000 to get some

content, to get it up and running and then take it from there."  (Yagalla Dep. II at 94-95.)
Braun, however, testified that Yagalla agreed to invest $150,000.  (Braun Dep. at 183,
186.)

In order to run the pornographic website, in May, 1999, Yagalla had his
accountant form a Delaware limited liability company, Nici Entertainment Group, LLC
("NEG").  (NEG Certificate of Formation, Affirmation of Howard I. Elman dated April
25, 2003 ("Elman Aff."), Ex. V.)  Braun was named as the managing member, and she
and Yagalla each held 50% interests in the company.  (Braun Dep. at 184; Yagalla Dep.
II at 95; NEG Certificate of Cancellation, Elman Aff., Ex. Z.)  On May 5, 1999, NEG
entered into an Exclusive Operating Agreement (the "Operating Agreement") with IEG,
LLC ("IEG"), the company which was to provide programming, technical expertise and
other services for the Nici's World website.  (Operating Agreement, Elman Aff., Ex. W.)
While the Operating Agreement, which both Yagalla and Braun signed, states that the
nicisworld.com and nicisgirls.com websites are owned by Braun and would be used to
drive traffic to the website formed by NEG, (id. § 2.2), Yagalla testified that part of his
oral agreement with Braun was that he would "be a partner in owning" nicisworld.com.
(Yagalla Dep. II. at 105.)  Yagalla also testified that he asked Braun to transfer ownership
of nicisworld.com to NEG, but that he didn't know whether Braun did so.  (Id.)

On June 1, 1999, Yagalla sent a $50,000 check made out to NEG to Braun, which
she deposited in the NEG bank account.  (Check from Yagalla to NEG, Elman Aff., Ex.
X; Braun Dep. at 203.)  Braun claims that shortly after receiving the $50,000 check, she
told Yagalla that $50,000 "was not going to be enough to fulfill our obligations to build a
website with IEG."  (Braun Dep. at 203.)  Braun also testified that she spent

approximately $42,300 of the $50,000 purchasing content for the Nici's World website. (Braun Dep. at 192-193.)  According to Yagalla, when he asked Braun whether she had purchased content for the website, Braun stated that "she was working on it."  (Yagalla Dep. II at 101.)  Yagalla explained that after he paid Braun $250,000 through the transfers in August and September, 1999, he told his accountant that he "didn't want anything to do with her [Braun]," and that he would "get around to dealing with [his interest in NEG] later on."  (Id. at 102.)  Though it is not clear when, Yagalla says that he asked Braun for an accounting of the funds he invested in NEG, but Braun never complied with his request.  (Id. at 105-06.)

Ultimately, NEG never did any business from which it received revenue, and Yagalla never received a return on his $50,000 investment.  (Yagalla Dep. I at 61; Braun Dep. at 193.)  Braun testified that while she thought that Yagalla's accountant had dissolved NEG in 1999, Yagalla called her in late 2000 and told her to dissolve NEG because he had been arrested and did not want the authorities to link them together.  (Id. at 209.)   And on March 29, 2001, Braun filed a certificate of cancellation for NEG. (NEG Certificate of Cancellation, Elman Aff., Ex. Z.)  According to Braun, Yagalla told her to keep the approximately $8,000 left of the $50,000 investment he made in NEG. (Braun Dep. at 193.)

At some point in 2000 or 2001, Braun launched an adult content website using the domain name www.nicisworld.com.  (Braun Dep. at 100-01.)  The website's patrons are charged a $29.95 monthly subscription fee, which allows them to view the website's pornographic materials.  (Id. at 101.)

**D. Romano**

In the spring of 2000, Yagalla's cohorts in his various stock manipulation schemes introduced him to Mario Romano ("Romano"), the owner of Romano Enterprises Limited, Ltd. ("Romano Enterprises"), a New Jersey corporation.  (Yagalla Dep. I. at 856-66; Yagalla Dep. II at 266-73.)  Yagalla was told that Romano is "a bull. That he knows how to buy stock.  He is a very aggressive broker.  And if you're looking someone to help in my deals, that Mario would be a great guy to have on my team." (Yagalla Dep. II at 266.)  Yagalla testified that he and Romano reached an agreement whereby Yagalla would pay Romano Enterprises $180,000 in exchange for Romano finding buyers for $1 million worth of TravelNow stock.  (Yagalla Dep. II at 270-72, 291, 313.)  At the time of the agreement, Yagalla says he told Romano that he controlled the market for TravelNow stock and that he "was close to the company."  (Yagalla Dep. II at 287-90, 312-13.)  Yagalla also offered the following testimony:

> Q. With regard to Mario Romano, is there anything, to the best of your knowledge, that would lead you to believe that Mr. Romano knew that you were engaged in the illegal manipulation of securities?
>
> A. Yes.
>
> Q. And what was that?
>
> A. I had told Mr. Romano that what did he need from me to continue our share of the deal.  And he said it's much easier to buy a stock that is going up than it is a stock that's going down.  In other words, if he got a client to buy 1000 shares at eight, and the stock went to nine, he can get the client to double up and buy another 1000 shares.  So it was a much easier sale for him.
>
> Q. And why did that – why does that make you believe that he was aware that you were engaged in manipulating securities?
>
> A. Because I told him that since I controlled the market, I could take it from eight to nine for him.

Q. Meaning that you would take –

A. The stock.

Q. When you referred to our deal, what were your referring to?

A. The deal whereby he would purchase a million dollars worth of Travelnow.

Q. And did you mean that he would personally purchase a million dollars?

A. Get his clients to purchase Travelnow.

(Yagalla Dep. II at 312-13.)

On June 5, 2000, Romano Enterprises sent ACM an $180,000 invoice for "[p]rofessional [s]ervices rendered for the month of May 2000."  (Romano Invoice to ACM, Licker Aff. 9/29/04, Ex. 28.)  On June 6, 2000, Yagalla had his secretary send a check from ACM to Romano Enterprises for $180,000.  (Yagalla Dep. II at 222-94; Check from ACM to Romano Enterprises, Licker Aff. 9/29/04, Ex. 29.)  Yagalla testified that Romano told him to indicate on the check that it was for consulting fees and the check stub states that the $180,000 was for "CONSULTING FEES."  (Check Stub, Declaration of Brian D. Graifman, Ex. A.; Yagalla Dep. II at 294.)  Yagalla explained, however, that the $180,000 was for Romano's participation in Yagalla's scheme to manipulate the price of TravelNow stock.  (Yagalla Dep. II at 270-72, 291, 313.)  The check bounced and Yagalla wired Romano the $180,000.  (Id. at 292-94.)

Romano invoked his Fifth Amendment privilege against self-incrimination in response to every substantive question put to him during his two depositions. (Deposition of Mario A. Romano dated February 6, 2003 ("Romano Dep. I") at 4-15; Deposition of Mario A. Romano dated March 28, 2003 ("Romano Dep. II") at 22-37.)

This includes questions about his receiving the $180,000 and participating in the

TravelNow stock manipulation.  (Romano Dep. I. at 6-9; Romano Dep. II at 23-27.)

Yagalla testified that Romano also helped negotiate a deal between Yagalla and

Joseph Quattrochi ("Quattrochi").  (Yagalla Dep. II at 269.)  According to Yagalla,

Romano explained that he could "only buy so much stock," and recommended that

Yagalla "do the deal with" Quattrochi and Romano's brother so that Yagalla could "have

a whole firm behind [him]."  (Id.)  The deal, as Yagalla described it, "was to be a deal for

payment of purchasing stock.  I was to loan them [Quattrochi and Romano's brother] one

million dollars, in exchange, they were to do five million dollars worth of buying

[TravelNow stock] at the end of a 60-day period."  (Id.)  While Yagalla never testified

that he in fact loaned Quattrochi the $1 million, on July 31, 2000, Quattrochi executed a

$1 million promissory note in favor of ACM.  (Promissory Note, Licker Aff. 9/29/04, Ex.

30.)  Records for a bank account in Quattrochi's name show a $1 million deposit on

August 1, 2000, but the source of the funds is not set forth.  (Quattrochi Bank Records,

Licker Aff. 9/24/2004, Ex. 40.)  Prior to the $1 million dollar deposit, Quattrochi's

account had a negative balance, and the Receiver has submitted two checks drawn on

Quattrochi's account, one for $555,000 and the other for $267,000, made payable to LPC

Capital Corporation ("LPC Capital"), Quattrochi's company.  (Checks from Quattrochi to

LPC Capital, Licker Aff. 9/24/04, Ex. 40.)  The checks were paid from Quattrochi's

account on August 2, 2000, but the statement for LPC Capital's bank account submitted

by the Receiver does not show a deposit in a corresponding amount.  (Quattrochi and

LPC Capital Bank Records, Licker Aff. 9/24/04, Ex. 40.)  The Receiver has also

submitted a barely legible copy of a check drawn on the LPC Capital account made out to

Romano for $91,963.34.  (Check from LPC Capital to Romano, Licker Aff. 9/24/04, Ex. 31.)  And the bank records for LPC Capital's account show that the check was paid on August 8, 2004.  (LPC Capital Bank Records, Licker Aff. 9/24/04, Ex. 40.)

Invoking his rights under the Fifth Amendment, during his deposition Quattrochi refused to answer any questions about his dealings with, and monies received from, Yagalla.  (Deposition of Joseph Quattrochi dated January 1, 2003 at 4-24.)  During his depositions, Romano was asked about his relationship with Quattrochi, and the $91,963.34 check from LPC Capital, but like Quattrochi, he asserted his Fifth Amendment rights and refused to answer.  (Romano Dep. I at 14-15; Romano Dep. II at 31-36.)

### E. The Collinses

Dr. Ronald Collins and his wife Lorraine Collins (together, "the Collinses") first invested with Yagalla in the spring of 1997.  (Deposition of Dr. Ronald Collins ("R. Collins Dep.") at 121-22, 193; Yagalla Dep. I at 119-20.)  Between 1997 and 1999, the Collinses, and other members of their family, opened sixteen separate accounts with Apex.  (Yagalla Dep. I. at 120.)  Each account had a distinct name and beneficial owner; six of the accounts were for the benefit of Ronald or Lorraine Collins.  (Id. at 120-21; Collins Defendants' Counter Statement in Opposition to Plaintiff's Statement of Undisputed Material Facts ("Collins Rule 56.1 Response") ¶ 45.)  Yagalla testified that the Collinses made the decision to open separate accounts.  (Yagalla Dep. I at 121.)  It is undisputed that the Collinses or entities they controlled established, and funded, the following six accounts:

| ACCOUNT | DATE | INITIAL FUNDING |
|---|---|---|
| COLLINS, Lorraine | 4/02/1997 | $15,000.00 |
| COLLINS, Ronald E. | 4/2/1997 | $50,000.00 |
| COLLINS, Catherine (CM Trust) | 9/25/1997 | $50,000.00 |
| COLLINS, Dental EBP | 10/1/1997 | $50,000.00 |
| COLLINS, R. Limited Partnership | 3/4/1998 | $334,000.00 |
| COLLINS, Lorraine (IRA) | 8/4/1998 | $50,028.92 |

(Affidavit of Karen Balmer ("Balmer Aff.") ¶ 3; Collins Rule 56.1 Response ¶ 47.)

Dr. Collins testified that he is the trustee of the "CM Trust Account," created in the name of his late wife, and that he has the right to invade the corpus to pay income to himself and others.  (R. Collins Dep. at 54-58.)  The "Dental EBP Account" was established with Dr. Collins' employees as participants.  (Id. at 134, 154-59.)  When the plan was liquidated in 1998, the account was renamed "Ronald Collins IRA."  (Id.)  Dr. Collins is the general partner of the R. Collins Limited Partnership and his children are the limited partners.  (Id. at 63-64.)  According to the Collinses, they believed that all advances to Apex were for the acquisition and maintenance of a stock portfolio at the brokerage firm A.G. Edwards.  (R. Collins Dep. at 121-22; Affidavit of Lorraine Collins dated April 2, 2001 ("L. Collins Aff. of 4/2/2001") ¶¶ 2,5, Affidavit of Harold Ruvoldt dated June 2, 2009 ("Ruvoldt Aff."), Ex. N.)

While the Collinses intended to invest exclusively in Apex, and not in Ashbury, (L. Collins Aff. of 4/2/2001 ¶ 4; Affidavit of Ronald Collins dated April 2, 2001 ("R. Collins Aff. of 4/2/2001") ¶ 4, Ruvoldt Aff., Ex. O), Yagalla initially opened the "Lorraine Collins IRA Account" as an Ashbury account.  (R. Collins Dep. at 192-93.)  When the Collinses learned of this, they told Yagalla that they did not want to invest in

Ashbury and the assets in the Lorraine Collins IRA Account were transferred to Apex within a month.  (<u>Id.</u> 192-93.)  In the spring of 1999, Yagalla told Dr. Collins that he had a "margin problem."  (Yagalla Dep. I at 486.)  To meet his claimed margin shortfall, Yagalla asked Dr. Collins to sign over "Fulton stock"[5] stock certificates worth approximately $888,857 for deposit in one of Dr. Collins' Apex accounts.  (<u>Id.</u> at 486-87.)  Unbeknownst to the Collinses, according to Yagalla, he deposited the "Fulton stock" in Ashbury's account at Bear Stearns.  (<u>Id.</u> at 487.)

Despite intending to invest solely in Apex, the Collinses received numerous checks and wires from Ashbury.  (R. Collins Dep. at 323-25.)  And according to the affidavit of Karen Balmer ("Balmer"), an accountant the Receiver retained, the Collinses received $3,551,831 in distributions from Ashbury between March 22, 1999 and October 2, 2000.  (Balmer Aff. ¶ 5.)  Balmer's affidavit does not, however, set forth the factual basis for the $3,551,831 figure.  Stuart Fleisher ("Fleisher"), another accountant retained by the Receiver, testified that "[i]t is impossible to distinguish between the funds and financial position of Yagalla and those of its affiliates or alter egos," because "funds went in one place and out the other and were transferred around without documentation, without a trail, or without knowing whose funds they were or why they were being transferred."  (Deposition of Stuart Fleisher ("Fleisher Dep.") at 170-71.)  Fleisher further testified that all of the entities Yagalla controlled were "operated as an economic entity and that's how we [the accountants retained by the Receiver] treated it."  (<u>Id.</u> at 171.)

According to Balmer, from April, 1997, though October, 2000, Dr. Collins deposited approximately $2,861,219.97 in the "Ronald Collins Account" and withdrew approximately $5,654,754.05, for a net excess above contributions of $2,793,534.08.

---

[5] The parties do not provide the name of the company that issued the "Fulton stock."

(Balmer Aff. ¶ 6.)  Balmer's affidavit also states that during the same period, Mrs.

Collins deposited approximately $333,715.91 in the "Lorraine Collins Account" and

withdrew approximately $665,908.68.  (Id. ¶ 7.)  According to Balmer's figures, which

are not supported by citation to the record, the withdrawals in excess of deposits for the

Lorraine Collins account would be $332,192.77, and the net withdrawals above

contributions for the two accounts would be $3,125,726.85.[6]

The Collinses have submitted the affidavit and report of Howard Silverstone

("Silverstone"), a certified public accountant and "Certified Fraud Examiner."  (Affidavit

of Howard Silverstone dated May 18, 2009 ("Silverstone Aff.") ¶ 1.)  Based on his

review of various documents, Silverstone concludes that Dr. Collins, Mrs. Collins, the

Ronald Collins LP, the Catherine Collins Trust and Collins Dental Associates (defined by

Silverstone as the "Collins Entities") collectively invested a total of $5,769,380 with

Yagalla from April, 1997 through December, 1999.  (Id. ¶ 7; Silverstone Report at 4,

Silverstone Aff., Ex. B.)[7]  According to Silverstone, "[a]nalysis of bank statement,

brokerage statements, checks, wire transfers and other documents for the accounts

maintained by the Collins Entities . . . during the time period from January 1997 through

December 2000, shows investment activity with the Yagalla Entities [defined as

---

[6] Either because of faulty math or typographical error, Balmer's affidavit states that the net withdrawals in excess of contributions for the Lorraine Collins account were $333,192.77.  (Balmer Aff. ¶ 7.)  Based on this figure, the Receiver initially calculates the net excess for the two accounts at $3,126.726.85.
(Receiver's Mem. in Supp. Mot. Summ. J. in Collins Action ("Receiver's Collins Action Mem. in Supp.") at 10.)  But the Receiver's calculation of the net excess withdrawals from the two accounts varies inexplicably throughout his memorandum in support of the motion for summary judgment.  See (Receiver's Collins Action Mem. in Supp. at 15 ($3,325,128), 19 ($3,027,128)).
[7] According to Silverstone, the $5,769,380 includes $4,830,495 in cash investments with Apex, in addition to $888,857 worth of Fulton stock and $50,028 in cash invested with Ashbury.  (Silverstone Aff. ¶ 7.)  The $5,769,380 also includes $432,209 in cash invested with Apex for the benefit of Dr. Collins' children.  (Id. ¶ 8.)

Ashbury, ACM, Apex and Yagalla himself] resulting in distributions in excess of deposits of $591,543." (Silverstone Aff. ¶ 10.)[8]

At some point in 1998, Dr. Collins spoke with his accountant, Jeffrey Morton ("Morton"), about Apex and Yagalla. (Deposition of Jeffrey Morton ("Morton Dep.") at 10.) Morton testified that "Dr. Collins . . . brought me some statements and said, [l]ook at these. And the problem was that there were no dividends being paid on the cash balances." (Id.) Dr. Collins' suggested that Morton meet with Yagalla. (Id. at 12.) And in a letter to Dr. Collins dated October 28, 1998, Morton explained that he had met with Yagalla and that he was "impressed with . . . [Yagalla] at lunch, but not all of my questions were answered." (Letter from Morton to Dr. Collins dated October 28, 1998, Ruvoldt Aff., Ex. GG.) Morton expressed his belief that Yagalla "has done well as far as total return and large profits," but cautioned that Yagalla is "a high risk investor" and that the Collinses, given their age and financial position, should invest more conservatively. (Id.) The letter also states that "you have too much invested under Mark's control. The accounts may not be insured for defalcation of Apex or Ashbury employees, or the insurance may not be enough to cover your potential losses." (Id.) Morton listed the following questions he had for Yagalla:

> What exactly is Apex Investment Corp.? Who are the officers of the company?

---

[8] Notwithstanding Silverstone's figures, in an affidavit dated July 22, 2002, Dr. Collins stated that from April, 1997 through the end of 1999 the "Collins entities" advanced $5,337,170.84 to Apex and from April, 1998 through October, 2000 the "Collins entities" withdrew $6,360,923 "for a sum total profit of $1,023,752.16." (Affidavit of Ronald Collins dated July 22, 2002 ¶ 3, Ruvoldt Aff., Ex. P.) In an affidavit dated April 2, 2001, Dr. Collins explained that from April, 1997 through 1999 "either I or my wife, or entities controlled by one of us," advanced $5,347,387.84 "to be deposited by Apex in brokerage accounts in our names or that of one of our entities for management by Apex." (R. Collins Aff. of 4/2/2001 ¶ 3) In the same affidavit, Dr. Collins stated that withdrawals amounting to $5,434,908.68 were made "[d]uring the life of the accounts owned by either my wife or me or entities controlled by one of us." (Id. ¶ 9.) Thus, according to Dr. Collins' April 2, 2001 affidavit, the net distributions above advances to the six accounts maintained by the Collinses at Apex would be $87,520.84.

> Who are the partners and officers of Ashbury Capital Management, L.C.C.?
>
> Who are the stockholders of Apex, Inc.?
>
> What insurance/bonding do the two businesses have?  What are the limits for employee defalcation[?]

(Id.)

Enclosed with his letter to Dr. Collins was a letter Morton sent to Yagalla on October 28, 1998.  Morton's letter to Yagalla states that "[w]e discussed the lack of dividends that occurred on all the accounts and your plan to reimburse all the accounts shortly for the missed dividends."  (Letter from Morton to Yagalla dated October 28, 1998, Ruvoldt Aff., Ex. HH.)  Morton asked Yagalla to provide him with certain statements, and noted Yagalla's "plan to have more detailed statements in the near future, before year end, after you have reviewed this with a software vendor for A.G. Edwards."  (Id.)  At the end of the letter, Morton included the same questions set forth in his letter to Dr. Collins.  (Id.)  Morton apparently never received the statements he asked Yagalla to provide, and when asked why he never followed up with Yagalla, Morton testified that "I did not suspect that he was doing anything wrong, so I didn't feel that I had to try to nail him down on anything."  (Morton Dep. at 54.)

Mrs. Collins explains that during the summer of 1999, on the advice of their accountant, she and Dr. Collins decided to diversify their investments "by liquidating a small amount of our stock holdings and purchasing real estate and meeting other financial obligations."  (L. Collins Aff. of 4/2/2001 ¶ 6.)  In the summer of 1999, Mrs. Collins also learned that she was going blind.  (L. Collins Dep. at 221.)  Mrs. Collins testified that the pending loss of her eyesight was part of the reason that she and her husband decided to

acquire real estate when they did, presumably so that Mrs. Collins would be able to see the properties before she lost her sight.  (Id.)  At the time the Collinses decided to diversify and invest in real estate, they received statements from Apex indicating that their "portfolio had a value of approximately $14,565,430.96."  (L. Collins Aff. of 4/2/2001 ¶ 6.)

        In 2000, the Collinses began making more frequent withdrawals for larger sums of money from their Apex accounts.  (Id. ¶ 9; R. Collins Aff. of 4/2/2001 ¶ 9.)  According to figures set forth in the affidavit of the Collinses' counsel, the Collinses withdrew $1,867,261 from April 17, 1998 through the end of 1999, and withdrew $4,493,662 from January 1, 2000 through October 6, 2000.  (Ruvoldt Aff. ¶ 5.)[9]  Mrs. Collins states that on March 28, 2000, she contracted to purchase seven properties located in Lewes, Delaware. (L. Collins Aff. 4/2/2001 ¶ 7.)  The closings for the seven properties were to occur on September 30, 2000.  (Id.)  Mrs. Collins states further that around the same time she contracted to purchase the properties, "we established a plan for periodic liquidations in accordance with a schedule, from our A.G. Edwards accountants to finance these land purchases and to begin diversifying our holdings."  (Id. ¶ 8.)  The specifics of the "plan" have not, however, been provided to the Court.  Yagalla testified that when he spoke to the Collinses about $6 million in withdrawals they sought to make in August and Septmber, 2000, the Collinses told him that they intended to use the funds to diversify their investments and to purchase real estate.  (Yagalla Dep. I at 555- 59.)

---

[9] These numbers correlate with those set forth in Silverstone's affidavit, but not with the affidavits the Collinses executed on April 2, 2001.  (L. Collins Aff. of 4/2/2001 ¶ 9; R. Collins Aff. of 4/2/2001 ¶ 9.) The Receiver contends, however, that the deposits and withdrawals set forth in the affidavit of Collinses' counsel are misleading and include activity in accounts in the names of the Collinses' children.  (Affidavit of Eugene Licker dated July 16, 2009 ("Licker Aff. 7/16/2009") ¶ 35.)

In 2000, Yagalla bounced seven checks issued to the Collinses for a total of $3.6 million. (Balmer Aff. ¶ 8.)  While Balmer states, without citing to the record, that the first bounced check was issued on January 31, 2000, and that the last was issued on September 15, 2000, (Id. ¶ 8.), Mrs. Collins testified that she believed that she and her husband received the first bounced check in April, 2000.  (L. Collins. Dep. at 129.) According to Mrs. Collins, after receiving the first of the seven bounced checks, she spoke with Yagalla who "laughed about it . . . [and] said he wrote it off the wrong account."  (Id.)  Mrs. Collins also testified that after April, 2000, Yagalla did not issue another bad check until September, 2000, when a check he made out to one of the Collinses' children bounced.  (Id. at 130.)

Over the course of their relationship, the Collinses became friendly with Yagalla. Yagalla spent time at the Collinses' home, and went on a cruise with the Collins family. (L. Collins Dep. at 118-19.)  Mrs. Collins testified that she would talk to Yagalla "[a] lot" and "stop in" his office if she was in the area.  (Id. at 33.)  Yagalla's secretary, Kimberly Lawrence ("Lawrence") testified, however, that in August or September, 2000, Mrs. Collins visited Yagalla's office more frequently.  (Deposition of Kimberly Lawrence ("Lawrence Dep.") at 40-41.)  According to Lawrence, Mrs. Collins "[w]anted to know where Mark was, what was going on."  (Id. at 41.)  Mrs. Collins explained that she was upset with Yagalla at the time because he was "undermining me to Ron [Dr. Collins]" with regard to her plan to invest in real estate.  (L. Collins Dep. at 182.)  According to Mrs. Collins, Yagalla "was very much against me buying land," and wanted the Collinses to instead invest their money in Ashbury.  (Id. at 183.)

On September 15, 2000, Mrs. Collins wrote Yagalla a letter stating "[a]fter careful thought and consultation I am directing you not to purchase any additional investments and not to sell any of the new existing securities or investment[s] in my Individual Retirement Account or my regular investment account without my direction." (Letter from Mrs. Collins to Yagalla dated September 15, 2000, Affidavit of Eugene Licker dated April 3, 2009 ("Licker Aff. 4/3/2009"), Ex. J.)  During her deposition, Mrs. Collins said that she "was extremely upset" that Yagalla was "coming between" her and her husband.  Shortly after sending Yagalla the letter, she demanded several times that Yagalla close all of the accounts and transfer the funds to her new broker.  (L. Collins Dep. at 186-89, 196.)  According to Dr. Collins, around the same time his wife was demanding that Yagalla close her accounts, he and his wife were having difficulty getting their money from Yagalla.  (R. Collins Dep. at 272.)  Despite this difficulty, Dr. Collins said that Yagalla "always paid."  (Id.)

On or about September 20, 2000, the Collinses and Mrs. Collins' daughter, Anne Dee Ackerman ("Ackerman"), met with Yagalla at his office.  (Yagalla Dep. I at 135.) According to Yagalla, "they were visibly upset . . . [and said] [y]ou promised us our money.  We didn't get it.  You gave us checks that are bouncing.  We're looking bad at Wilmington Trust, our bank."  (Id. at 135-36.)  When asked to "come clean," Yagalla says he told the Collinses and Ms. Ackerman that he was using all of his investors' money to trade for himself.  (Id. at 136.)  At the meeting, Yagalla explained that "I had borrowed against . . . [investor funds] to trade in my personal account and that I have experienced significant losses."  (Id.)  Yagalla also said that he owed Lehman Brothers a debt of approximately $7 million, which he could not repay.  (Id.)

According to Yagalla, the Collinses asked him who he could raise money from, and suggested that he ask his uncle, Bill Dolinsky, for a loan.  (Id.)  When Yagalla told the Collinses that his uncle did not have enough money to make the loan, Yagalla testified that the Collinses said "do whatever you can, whomever you need to get money from, you go out, you raise the money."  (Id. at 137.)  Yagalla, however, also admitted that he did not believe that the Collinses knew he was engaged in a Ponzi scheme, and that he did not believe that Collinses were telling him "to go participate in a Ponzi scheme to get them paid."  (Yagalla Dep. II at 583-85.)  He explained to the Collinses that their money was still in their accounts "just sort of frozen," because he was trading on margin and needed additional funds to meet his margin requirements.  (Id. at 583-84.)

After the meeting, Yagalla "embark[ed] on a money raising trip."  (Id. at 588.)  Yagalla testified that in the weeks following the meeting, whenever he was able to raise money from other investors, he would "turn[] around and wire[] it to Ron and Lorraine."  (Yagalla Dep. I at 137-38.)   And according to Yagalla, "I told them I was giving them investor money that I was raising from other investors . . . ."  (Yagalla Dep. II at 588.)

On October 2, 2000, the Collinses sent Yagalla a letter demanding that he transfer all stocks and funds in their accounts to Morgan Stanley Dean Witter ("Morgan Stanley").  (Letter from the Collinses to Yagalla dated October 2, 2000, Licker Aff. 4/3/2009, Ex. K.)  The letter states:

> The formal request for funds made previously resulted in checks being issued later than requested and the checks issued were not valid and were bogus. . . . After a great deal of problems you indicated that you had wired some of the funds, but these wires had FAKE numbers[.]  You are in violation of your prospectus and I believe State of Delaware securities law.  Your reason that several of these problems occurred is that our account is on margin, we have repeated[ly] told you that we do not want our account on margin. . . . All of the Collins accounts should be moved

out of your accounts. . . . Should the transfer of these accounts not take
place we feel that our next step is to notify the SEC.

(Id.)  Shortly after Yagalla received the letter, Yagalla says that he told Dr. Collins that "I
can't have a mass exodus of clientele right now."  (Yagalla Dep. I at 142.)  Yagalla told
Dr. Collins that Ralph Stradley ("Stradley"), another investor, had also requested to close
his accounts.  (Id. at 141.)  According to Yagalla, Dr. Collins said he would call Stradley
and "find out why he wants to pull out."  (Id. at 142.)  Yagalla testified that Dr. Collins
later told him that he had called Stradley and convinced him not to withdraw his
investment.  (Id.)  Dr. Collins, however, says that he called Stradley about putting a new
phone line in his home and Stradley happened to tell him that he was considering
requesting the return of his investment.  (R. Collins Dep. at 301.)  When Stradley said
this, Dr. Collins responded "oh, that's surprising, but that's up to you, whatever your
decision is.  That was it."  (Id.)  After Dr. Collins spoke with Stradley, Yagalla received a
letter from Stradley stating "to disregard his previous letter, that he was going to stay in
and not withdraw his money."  (Yagalla Dep. I at 143.)  Yagalla claims that like her
husband, Mrs. Collins reassured another investor, Perry Scarfo, that Yagalla was not
having any problems.  (Id. at 143-44.)

The Collinses sent Yagalla another letter on October 11, 2000, instructing him to
close their accounts and transfer all stocks and funds to Morgan Stanley.  (Letter from the
Collinses to Yagalla dated October 11, 2000, Licker Aff. 4/3/2009, Ex. L.)  The letter
references two bounced checks, one for $345,000 and the other for $500,000, and
requests that Yagalla return "42,910 shares of Fulton Stock."  (Id.)  The Collinses ended
the letter by stating that, "[s]ince there has been no cooperation with our requests we have
no option other than to contact the SEC, Jim Robb of the Attorney General Office and a

28

securities attorney to sue for our funds.  We feel that you have grossly violated your fiduciary responsibilities and our PAST friendship."  (Id.)  The Collinses, however, wrote that they would wait until October 20th to contact the SEC "in the hopes that all accounts have totally been transferred by then . . . ."  (Id.)  During his deposition, Dr. Collins downplayed the importance of the letter, and explained that when he and his wife wrote the letter he did not have any concerns about Yagalla's financial dealings because he trusted him.  (R. Collins Dep. at 289-297.)

Around the same time the Collinses sent Yagalla the October 11, 2000 letter, Mrs. Collins called Bill Dolinsky and said "I'm just calling to tell you, I am an Apex investor, I met you once, and Mark just doesn't seem focused."  (L. Collins Dep. at 157.)  Mr. Dolinsky suggested that he and the Collinses have a meeting with Yagalla at the Collinses' home.  (Id.)  On or about October 16, 2000, either Dr. or Mrs. Collins called the SEC and asked how to set up an appointment.  (Morton Dep. at 147.)

On October 17, 2000, Yagalla met with several investors at the Collinses' home in Delaware.  (R. Collins Dep. at 352-354.)  When Yagalla arrived at the meeting, he told the group that the SEC had accused him of stock manipulation (this was false), that only approximately 30% of the funds previously held in Apex and Ashbury remained, and that he had already consulted an attorney.  (L. Collins Dep. at 164.)  Yagalla was arrested a day after the meeting.

Following his appointment by the Court, the Receiver commenced the Collins Action against the Collinses and their children (the "Collins Children").  (Licker Aff. 7/16/2009 ¶ 8.)  The Collins Children settled with the Receiver for $2,585,000 and the

claims against them were dismissed on March 15, 2002.  (Id. ¶ 9.)[10]  In November, 2002,

Judge Casey ordered the Collinses to participate in mediation.  (Id. ¶ 10.)  During

negotiations, counsel for the Collinses, Harold Ruvoldt ("Ruvoldt"), made clear that the

Collinses wanted the terms of any settlement to protect them from lawsuits related to

their involvement with Yagalla.  (Licker Aff. 7/16/09 ¶ 13.)  The Collinses had been sued

by Perry Scarfo ("Scarfo"), who, as noted, was another Yagalla investor.  (Id.)  Scarfo

alleged that the Collinses had, among other things, conspired with, and received

preferential transfers from, Yagalla.  (Scarfo Delaware Complaint, Ruvoldt Aff., Ex. EE.)

Counsel for the receiver, Eugene Licker ("Licker"), explains that during

mediation Ruvoldt took the position that the Court has the authority to enjoin all persons,

regardless of whether they are parties to the Collins or SEC Actions, from bringing suit

against the Collinses on the basis of any claim related to Yagalla.  (Licker Aff. 7/16/09 ¶

17.)  Licker states that neither he, the Receiver nor the mediator were familiar with the

principle of law expressed by Ruvoldt, but that they accepted his representations.  (Id.)

Ultimately, mediation was successful, and the parties memorialized a settlement

in a Stipulation and Order (the "Stipulation") that Judge Casey "so ordered" on April 21,

2004.  (Stipulation and Order, Ruvoldt Aff., Ex. DD, Licker Aff. ¶ 10; Casey Action Dkt.

# 34.)  Pursuant to the settlement terms, as set forth in the Stipulation, the Collinses were

to transfer $1,650,000 to the Receiver.  (Stipulation and Order ¶ 2.)  The settlement was,

however, conditional.  Paragraph three of the Stipulation states:

> The Parties' rights and obligations hereunder, including without limitation
> the obligation of the Settling Defendants to pay the Settlement Sum, as
> described in Paragraph 2 above, is conditioned on the entry by the Court

---

[10] An entity called "Collins Chiropractic" was also named as a defendant; it was dismissed from the case at
the same time as the Collins Children.  The Receiver brought a separate action against Ackerman, who
settled for $424,000 on March 17, 2003.  (Stipulation and Order, Ruvoldt Aff., Ex. CC.)

of an Order (i) approving the Stipulation, and (ii) barring third parties with notice of the Settlement from pursuing any claim against the Settling Defendants arising out of, concerning, or related to any investment with Yagalla or his entities (the "Bar Order"). The Bar Order shall provide that the Court has made a factual finding that the receiver has the authority to bind the receivership. In the event that the Court does not approve the Stipulation or enter the Bar Order, the settlement described herein, and this Stipulation, shall be void in its entirety. The Stipulation may however, be conditionally approved by the Court prior to the return date of the motion for a Bar Order.

(Id. ¶ 3.) The Stipulation's fourth paragraph sets forth the process the parties agreed to

follow in seeking the bar order:

The Receiver and the Settling Defendants shall jointly submit a motion to the Court seeking entry of the Bar Order. The Settling Defendants shall draft and cooperate with the Receiver in the preparation of the motion and shall pay all out of pocket costs associated with providing notice of the proposed Bar Order to third parties. The Receiver shall provide notice of the motion to all persons and entities who have submitted claims against the receivership and from whom the Receiver has requested claims. The Receiver agrees to provide timely notice of the motion to any additional person or entity to whom the Settling Defendants reasonably request such notice be given. The Settling Defendants may also publish the notice of motion at their discretion.

(Id. ¶ 4.)

On April 8, 2004, Ruvoldt sent Licker a notice of motion for a bar order along

with a supporting affidavit and memorandum of law. (Bar Order Materials, Ruvoldt Aff.,

Ex. EE.) Licker was not, however, satisfied with the legal support Ruvoldt offered for

the Court's authority to issue a bar order binding non-parties. (Licker Aff. 7/16/2009 ¶

20.) Licker was unwilling to accept Ruvoldt's proposed memorandum of law because

none of the cases involved situations where a court imposed an injunction binding a

person who was not a party to the lawsuit. (Id. ¶21.) Instead, the cases cited simply

discussed general principles of law or dealt with the court's power to issue a bar order

binding parties to a lawsuit. (Id.) Licker told Ruvoldt that he could not agree to file the

application for a bar order in light of the insufficient legal authority.  (Id. ¶ 22.)  Ruvoldt,

on the other hand, believed that he had provided adequate legal support.  (Id.)

Over the following months, Licker did his own research on the issue, discussed

the matter with SEC staff attorneys and contacted other receivers for their opinion.  (Id. ¶

24.)  All of this was to no avail; Licker could find no legal basis for the Court issuing a

bar order binding non-parties.  (Id. ¶ 24.)  Licker offered alternatives to a bar order.  (Id.

¶¶ 25-27.)  He explained that since the Scarfo suit had been dismissed, and given the

passage of time, the Collinses' exposure to suit was limited; but the Collinses made clear

that the bar order was critical.  (Id. ¶¶ 25-29.)  Licker also offered to settle the action

without a bar order for a lesser amount, and the Collinses offered $800,000.  (Id. ¶ 30.)  A

50% reduction in the settlement amount was, however, unacceptable to the Receiver.  (Id.

¶ 31.)  In the end, the motion for a bar order was never filed with the Court, and the

Receiver did not provide notice of the motion to persons who had submitted claims

against the receivership.  By order of Judge Swain dated October 25, 2007, the Collins

Action was restored to the Court's active docket.

## II. Procedural History

### A. The Collins Action

The Receiver commenced the Collins Action on March 22, 2001.[11]  Counts I

through IV of the six-count Complaint (the "Collins Complaint") allege claims of actual

and constructive fraudulent transfer under the Uniform Fraudulent Transfers Act

("UFTA" or "the Act").  Through the actual and constructive fraudulent transfer claims,

the Receiver seeks to void and recover millions of dollars in transfers from Yagalla and

---

[11] As noted, the Collins Children and Collins Chiropractic were also named as defendants but settled with
the Receiver.  The Collinses are the only defendants remaining in the Collins Action.

the entities he controlled to the Collinses.  Counts V and VI of the <u>Collins</u> Complaint allege claims of unjust enrichment and constructive trust.  In their Answer, the Collinses set forth a three-count Counterclaim asserting claims for misrepresentation, fraud and unjust enrichment.  The Collinses seek to recover $22,243,639.05, the "full value" of their portfolio as of September, 2000.

On April 3, 2009, the Receiver moved for partial summary judgment.  In his memorandum in support of the motion, the Receiver asks the Court to void all transfers the Collinses received from Ashbury as actually or constructively fraudulent.  In the alternative, the Receiver contends that summary judgment should be granted voiding all transfers from the Ronald Collins and Lorraine Collins Accounts in excess of the Collinses' deposits in the accounts.  In his reply memorandum, however, the Receiver argues that summary judgment should be granted voiding all transfers to the Collinses as actually fraudulent.  The Collinses cross-moved for partial summary judgment on June 3, 2009.  The Collinses ask the Court to enforce the 2004 settlement, or in the alternative, to find that the Receiver is equitably estopped from recovering in excess of the $1.65 million settlement amount they agreed pay.  The Collinses also contend that summary judgment should be granted on the Receiver's actual fraud claims because, as a matter of undisputed fact, they received all transfers from Yagalla in good faith.

## B. The <u>Braun</u> Action

The <u>Braun</u> Action was commenced by the Receiver on May 10, 2002.[12]  Counts III through VI of the eight-count Complaint (the "<u>Braun</u> Complaint") assert claims of actual and constructive fraudulent transfer under the UFTA.  The Receiver seeks to void

---

[12] The defendants in the <u>Braun</u> Action are Braun, NEG, Nici, Inc. and Nici Enterprises, Inc.  (collectively, "Braun").

over $600,000 in transfers from Yagalla and the entities he controlled to Braun. Counts

VII and VIII are for unjust enrichment and constructive trust. In Counts I and II the

Receiver asserts claims for breach of contract and breach of fiduciary duty based on

Yagalla's and Braun's agreement to create and operate Nici's World.

On April 25, 2003, the Receiver moved for partial summary judgment. The

Receiver seeks summary judgment on his claims that the $126,000 Yagalla paid to Braun

for escorts, and $250,000 Yagalla paid to Braun for finding him a "girlfriend," were

actually or constructively fraudulent transfers and should therefore be voided. On June

10, 2003, Braun cross-moved for summary judgment on all claims. Braun argues that, as

a matter of undisputed fact, she provided Yagalla with reasonably equivalent value for all

transfers made to her, and so the fraudulent transfer claims should be dismissed. Braun

also contends that she is entitled to summary judgment on the Receiver's fraudulent

transfer claims based on the $180,000 to $360,000 sent to her via Federal Express, and

the 10,000 shares of Intelliworxx stock, because there is no evidence that the transfers

occurred. According to Braun, the Receiver's breach of contract and breach of fiduciary

duty claims must be dismissed because Yagalla, not Braun, breached the oral contract to

run Nici's World, and because there is no evidence that she breached her fiduciary duty

to Yagalla as the general partner of NEG.

## C. The **Romano** Action

The Receiver commenced the <u>Romano</u> Action on April 11, 2002, and on April 1,

2003, the Receiver filed an Amended Complaint (the "<u>Romano</u> Amended Complaint").[13]

Counts I through IV assert actual and constructive fraudulent transfer claims under the

UFTA. In Counts V and VI the Receiver asserts claims for unjust enrichment and

---

[13] The defendants in the <u>Romano</u> Action are Romano and Romano Enterprises (collectively, "Romano").

constructive trust.  The Receiver seeks to void and recover a minimum $271,000 in

allegedly fraudulent transfers Yagalla and the entities he controlled made to Romano.

The Receiver moved for partial summary judgment on December 13, 2004.  The

Receiver argues that summary judgment should be granted voiding the $180,000 and

$93,963 transfers to Romano as actually or constructively fraudulent because it is

undisputed that Romano did not provide lawful consideration for the transfers.

According to the Receiver, the transfers were in recompense for Romano's role in

manipulating TravelNow stock.

## DISCUSSION

### III. Summary Judgment Standard

Summary judgment is appropriate where the record demonstrates that "there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  A fact is material if it "might affect the outcome of

the suit under governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).  The moving party bears the initial burden of producing evidence on each

material element of its claim or defense demonstrating that it is entitled to relief.  See

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The evidence on each material

element must be sufficient to entitle the movant to relief as a matter of law.  See Vt.

Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).

Once the moving party has made an initial showing that no genuine issue of

material fact remains, the nonmoving party may not refute this showing solely by means

of "[c]onclusory allegations, conjecture, and speculation," Niagara Mohawk Power Corp.

v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (internal citations and quotations

omitted), but must instead present specific evidence in support of its contention that there is a genuine dispute as to material facts. Fed. R. Civ. P. 56(e). The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)).

The same standard of review applies when the court is faced with cross-motions for summary judgment. Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001). Each party's motion must be reviewed on its own merits, and the Court must draw all reasonable inferences against the party whose motion is under consideration. Id.

## IV. The Uniform Fraudulent Transfers Act ("UFTA")

The UFTA has been adopted by a vast majority of states and is "designed to prevent debtors from transferring their property in bad faith before creditors can reach it." BMG Music v. Martinez, 74 F.3d 87, 89 (5th Cir. 1996). It is undisputed that Delaware law applies to the fraudulent transfer claims in the Collins Action; that Delaware or California law applies to the fraudulent transfer claims in the Braun Action; and that Delaware or New Jersey law applies to the fraudulent transfer claims in the Romano Action. Each of these states has adopted the UFTA, see Del. Code Ann. tit. 6, §§ 1301-1311; Cal. Civil Code §§ 3439-3439.12; N.J. Stat. Ann. §§ 25:2-20-25:2-33, and the relevant portions of each state's UFTA are substantively identical. And courts in these three states look to the law of other jurisdictions that have adopted the UFTA for guidance in interpreting the Act. See August v. August, No. 3180, 2009 WL 458778, at *10 n.63 (Del. Ch. Feb. 20, 2009); SASCO 1997 NU, LLC v. Zudkewich, 767 A.2d 469, 474 (N.J. 2001); Macedo v. Bosio, 104 Cal. Rptr. 2d 1, 4 (Cal. Ct. App. 2001). Since the

UFTA is similar to the fraudulent transfer provisions of the Bankruptcy Code, courts also look to cases interpreting the Bankruptcy Code in applying the UFTA.  See 11 U.S.C §§ 548(a)(1)(A) and (B); Official Comm. of Unsecured Creditors of Fedders N. Am. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am.), 405 B.R. 527, 547 (Bankr. D. Del. 2009) (noting that the language of the Delaware and New Jersey versions of the UFTA "track the language of each other, and also mirror the language of section 548(a)(1)(A) and (B) of the [Bankruptcy] Code."); Bay Plastics, Inc. v. BT Commercial Corp. (In re Bay Plastics), 187 B.R. 315, 322 (Bankr. C.D. Cal. 1995 (noting that the California version of the UFTA and § 548 of the Bankruptcy Code "contain[] similar fraudulent transfer provision[s]."); see also Fid. Bond & Mortgage Co. v. Brand, 371 B.R. 708, 719 (E.D. Pa. 2007) ("When drafting the model [UFTA], the authors looked to the federal Bankruptcy Code for guidance.").

"There are two theories under which a receiver may proceed under UFTA: actual fraud or constructive fraud."  Donell v. Kowell, 533 F.3d 762, 770 (9th Cir. 2008). The first theory, actual fraud (also called "fraud in fact"), is set forth in Section 4(a)(1) of the UFTA:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor[.]

UFTA § 4(a)(1); see Del. Code Ann. tit. 6, § 1304(a)(1); Cal. Civil Code § 3439.04(a)(1); N.J. Stat. Ann. § 25:2-25(a).  Since ascertaining whether the debtor transferred assets with actual intent to "hinder, delay, or defraud" creditors may be difficult, the UFTA

provides a non-exclusive list of eleven "badges of fraud" from which an inference of fraudulent intent may be drawn.  UFTA § 4(b); <u>see</u> Del. Code Ann. tit. 6, § 1304(b); Cal. Civil Code § 3439.04(b); N.J. Stat. Ann. § 25:2-26.

A creditor seeking to void a transfer under the actual fraud provision of the UFTA bears the burden of proving the elements of actual fraud.  <u>See</u> <u>Wachovia Securities, LLC v. Neuhauser</u>, 528 F. Supp. 2d 834, 858 (N.D. Ill. 2007).  If the creditor carries its burden of proving actual fraud, then the burden shifts to the recipient of the transfer to prove the defense of good faith.  <u>See</u> <u>Terry v. June</u>, 432 F. Supp. 2d 635, 641 (W.D. Va. 2006) ("Courts have widely held that the transferee bears the burden of establishing th[e] [good faith] affirmative defense.") (collecting cases).  The good faith defense is found in Section 8(a) of the UFTA and provides that "[a] transfer or obligation is not voidable under Section 4(a)(1) against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee."  UFTA § 8(a); <u>see</u> Del. Code Ann. tit. 6, § 1308(a); Cal. Civil Code § 3439.08(a); N.J. Stat. Ann. § 25:2-30(a).

"In order to establish the element of good faith, the transferee must prove that he received the conveyance in objective good faith."  <u>Terry</u>, 432 F. Supp. 2d at 641.  The question of good faith "must be determined on a case-by-case basis by examining whether the facts would have caused a reasonable transferee to inquire into whether the transferor's purpose in effectuating the transfer was to delay, hinder, or defraud the transferor's creditors."  <u>Herup v. First Boston Fin., LLC</u>, 162 P.3d 870, 875 (Nev. 2007) (collecting cases).  "One lacks the good faith that is essential to the UFTA § 8(a) defense to avoidability if possessed of enough knowledge of the actual facts to induce a reasonable person to inquire further about the transaction.  Such inquiry notice suffices

on the rationale that some facts suggest the presence of others to which a transferee may not safely turn a blind eye." Ponoma Valley Imps., Inc. v. Plotkin (In re Cohen), 199 B.R. 709, 719 (B.A.P. 9th Cir. 1996) (internal citations omitted).  A transferee's "lack of actual knowledge of the transferor's fraudulent purpose is relevant to determining whether he received the conveyances in objective good faith, but it is not dispositive." Terry, 432 F. Supp. 2d at 641.

"The critical time to determine whether a debtor receives reasonably equivalent value is the time of the transfer."  Slone v. Lassiter (In re Grove-Merritt), 406 B.R. 778, 805 (Bankr. S.D. Ohio 2009).  In determining whether the debtor received reasonably equivalent value, the court must "look at what 'value' the debtor received in return for the transfer.  The court must then determine whether the value received is reasonably equivalent; this will depend on the facts of each case." Kipperman v. Onex Corp., 411 B.R. 805, 837 (N.D. Ga. 2009).  Whether reasonably equivalent value has been given "is typically a question of fact." Neuhauser, 528 F. Supp. 2d at 859.

The second theory of recovery under the UFTA, constructive fraud (also called "fraud in law"), is set forth in Section 4(a)(2):

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> . . .
>
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

> (ii) intended to incur, or believed or reasonably should have believed that he [or she] would incur, debts beyond his [or her] ability to pay as they became due.

UFTA § 4(a)(2); see Del. Code Ann. tit. 6, § 1304(a)(2); Cal. Civil Code § 3439.04(a)(2); N.J. Stat. Ann. § 25:2-25(b).  As with actual fraud, a creditor seeking to void a transfer bears the burden of proving constructive fraud.  See Bohm v. Dolata (In re Dolata), 306 B.R. 97, 117 (Bankr. W.D. Pa. 2004).  Unlike actual fraud, however, constructive fraud "does not require any showing of fraudulent intent."  Grochocinski v. Zeigler (In re Zeigler), 320 B.R. 362, 374 (N.D. Ill. 2005).  Instead, "[l]ack of consideration or inadequate consideration for a debtor's conveyance, coupled with the existence or prospect of other unpaid creditors, triggers the 'fraud in law' theory in which intent to hinder, delay or defraud is presumed from the circumstances."  Krol v. Wilcek (In re H. King & Assocs.), 295 B.R. 246, 289 (Bankr. N.D. Ill. 2003).  If the debtor is insolvent at the time of the transfer sought to be voided as constructively fraudulent, the debtor necessarily had unreasonably small capital and intended to incur debts beyond its ability to pay.  UFTA § 4(a)(2)(i)(ii); see Norland v. Morefield (In re Nat'l Liquidators, Inc.), 232 B.R. 915, 919 (Bankr. S.D. Ohio 1998).  And so, if the debtor is insolvent at the time of the transfer, and the transferee does not provide "reasonably equivalent value," the transfer is constructively fraudulent and voidable.  UFTA § 4(a)(2).

A rather sizeable body of fraudulent transfer law has built up around Ponzi schemes.[14]  In considering claims of actual fraud, "courts have widely found that Ponzi

---

[14] Charles Ponzi, not of blessed memory, has the ignominious distinction of having a pattern of fraudulent conduct, the "Ponzi scheme," named after him.  A more specific definition of "Ponzi scheme," as the term is used in the context of fraudulent transfer law, is set forth below.  "Generally, a Ponzi scheme is a phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors."  In re Bonham, 229 F.3d 750, 759 n.1 (9th Cir. 2000).  The Supreme Court provided a detailed description of Mr. Ponzi's "remarkable criminal career" in Cunningham v. Brown, 265 U.S. 1 (1924).

scheme operators necessarily act with actual intent to defraud creditors due to the very

nature of their schemes."  Terry, 432 F. Supp. 2d at 639; see Wiand v. Waxenberg, 611 F.

Supp. 2d 1299, 1312 (M.D. Fla. 2009) (under the Florida version of the UFTA "a Ponzi

scheme suffices, as a matter of law, to prove actual intent to defraud."); Donnell v.

Kowell, 533 F.3d 762, 770 (9th Cir. 2008) ("[T]he mere existence of a Ponzi scheme is

sufficient to establish actual intent to defraud."); SEC v. Resource Dev. Int'l, LLC, 487

F.3d 295, 301 (5th Cir. 2007) ("In this circuit, proving that IREC [the debtor] operated as

a Ponzi scheme establishes the fraudulent intent behind the transfers it made."); see also

Mark A. McDermott, Ponzi Schemes and the Law of Fraudulent and Preferential

Transfers, 72 Am. Bankr. L.J. 157, 173-75 (1998).[15]  The reason is,

> [o]ne can infer an intent to defraud future undertakers [investors] from the
> mere fact that a debtor was running a Ponzi scheme.  Indeed, no other
> reasonable inference is possible.  A Ponzi scheme cannot work forever.
> The investor pool is a limited resource and will eventually run dry.  The
> perpetrator must know that the scheme will eventually collapse as a result
> of the inability to attract new investors. The perpetrator nevertheless
> makes payments to present investors, which, by definition, are meant to
> attract new investors.  He must know all along, from the very nature of his
> activities, that investors at the end of the line will lose their money.
> Knowledge to a substantial certainty constitutes intent in the eyes of the
> law.

Liebersohn v. Campus Crusade for Christ, Inc. (In re C.F. Foods, L.P.), 280 B.R. 103,

110 (Bankr. E.D. Pa. 2002).

Courts have also held that debtors operating Ponzi schemes are, by definition,

insolvent.  See Cunningham, 265 U.S. at 8 (explaining that given his fraudulent scheme,

Charles Ponzi "was always insolvent, and became daily more so, the more his business

succeeded."); Warfield v. Byron, 436 F.3d 551, 558 (5th Cir. 2006) ("a Ponzi scheme . . .

---

[15] This Court has, however, noted "the possibility . . . that certain transfers may be so unrelated to a Ponzi
scheme that the presumption should not apply . . . ."  Bear Stearns Secs. Corp. v. Gredd (In re Manhattan
Invs. Fund Ltd.), 397 B.R. 1, 11 (2007).

is, as a matter of law, insolvent from its inception.); <u>Scholes v. Lehmann</u>, 56 F.3d 750,

755 (7th Cir. 1995) (Posner, J.) (explaining that because "*defrauded* investors . . . are tort

creditors" corporations run as part of Ponzi scheme "were insolvent from the outset and

could have been petitioned into bankruptcy."); <u>Daley v. Deptula (In re Carrozzella &</u>

<u>Richardson)</u>, 286 B.R. 480, 486 n.17 (D. Conn. 2002) ("a number of courts have held that

an enterprise engaged in a Ponzi scheme is insolvent from its inception and becomes

increasingly insolvent as the scheme progresses."); <u>see</u> <u>also</u> McDermott, <u>Ponzi Schemes</u>,

<u>supra</u>, at 171-72.  Given the insolvency of debtors engaged in Ponzi schemes, proof that a

transfer was made "pursuant to a Ponzi scheme generally establishes that the scheme

operator '[w]as engaged or about to engage in a business or a transaction for which the

remaining assets of the debtor were unreasonably small in relation to the business or

transaction,' or '[i]ntended to incur, or believed  or reasonably should have believed that

he or she would incur, debts beyond his or her ability to pay as they became due."

<u>Donnell</u>, 533 F.3d at 770-71 (internal citations omitted); <u>see</u> <u>also</u> <u>In re Nat'l Liquidators</u>,

232 B.R at 919 ("While the Debtor's intent to incur debts that were beyond its ability to

pay is not known specifically, it can be inferred as a result of the debtor's continuous

insolvency and operation of a Ponzi scheme."); <u>Emerson v. Maples (In re Mark Benskin</u>

<u>& Co.)</u>, 161 B.R. 644, 650 (Bankr. W.D. Tenn. 1993) (explaining that where debtor

operated primarily on "fraudulently obtained funds . . . [i]t would seem axiomatic that the

debtor was operating its business with unreasonably small capital.").

By "investing" in a Ponzi scheme run by the debtor, even unwittingly, a person

does not – strictly speaking – provide "value."  This is because the money invested

simply perpetuates the debtor's fraudulent scheme: "the longer a Ponzi scheme is kept

going the greater the losses to the investors." <u>Scholes</u>, 56 F.3d at 757.  But, courts have

held "that a defrauded investor in a Ponzi scheme gives 'value' to the debtor in the form

of a dollar-for-dollar reduction in the investor's restitution claim against the Ponzi

scheme."  <u>Jobin v. Ripley (In re M&L Bus. Machine Co.)</u>, 198 B.R. 800, 810 n.4 (D.

Colo. 1996) (collecting cases); <u>see</u> <u>Donnell</u>, 533 F.3d at 771; <u>Jordan v. Kroneberger (In re</u>

<u>Jordan)</u>, 329 B.R. 428, 442-43 (Bankr. D. Idaho 2008).  Investors can not, however,

retain fictitious profits received from a debtor engaged in a Ponzi scheme because, as

explained by Judge Posner,

> [a] profit is not offset by anything; it is the residuum of income that
> remains when costs are netted against revenues.  The paying out of profits
> to Phillips [the Ponzi scheme investor] not offset by further investments
> by him conferred no benefit on the corporations [involved in the Ponzi
> scheme] but merely depleted their resources faster.

<u>Scholes</u>, 56 F.3d at 757.

The end result of the intersection of fraudulent transfer law and Ponzi schemes –

as far as investors in the scheme are concerned – is that,

> whether the receiver seeks to recover from winning investors under the
> actual fraud or constructive fraud theories generally does not impact the
> amount of recovery from innocent investors.  Under the actual fraud
> theory, the receiver may recover the entire amount paid to the winning
> investor, *including* amounts which could be considered "return of
> principal."  However, there is a "good faith" defense that permits an
> innocent winning investor to retain funds up to the amount of the initial
> outlay.  Under the constructive fraud theory, the receiver may only recover
> "profits" above the initial outlay . . . .

<u>Donnell</u>, 533 F.3d at 771.

**V. Common Questions**

The Collinses contend that the Receiver has not proven that Yagalla ran a Ponzi

scheme, and as a result, he has not shown as a matter of undisputed fact that Yagalla

made the transfers to them with "intent to hinder, delay, or defraud" his creditors.   The

Collinses, Romano and Braun all argue that there is a question of fact as to whether

Yagalla, Ashbury, ACM and Apex were insolvent at the time the transfers were made.

Thus, the Defendants assert that the Receiver's motions for summary judgment on his

actual and constructive fraud claims must be denied.  The Court finds that Yagalla ran a

Ponzi scheme and that Yagalla (and his related entities Ashbury, ACM and Apex) were

never solvent.  Accordingly, the Court rejects the Collinses', Romano's and Braun's

arguments.

**A. Existence of a Ponzi Scheme**

To prove Yagalla engaged in a Ponzi scheme, the Receiver must establish "that

1) deposits were made by investors; 2) the Debtor conducted little or no legitimate

business operations as represented to investors; 3) the purported business operation of the

Debtor produced little or no profits or earnings; and 4) the source of payments to

investors was from cash infused by new investors."  Forman v. Salzano (In re

Norvergence, Inc.), 405 B.R. 709, 730 (Bankr. D. N.J. 2009) (quoting Rieser v. Hayslip

(In re Canyon Sys. Corp.), 343 B.R. 615, 629 (Bankr. S.D. Ohio 2006)); see Wiand, 611

F. Supp. 2d at 1312 (same).

Yagalla testified that he ran a "Ponzi scheme" and that he ran the scheme "[f]rom

the very beginning, in 1995."  (Yagalla Dep I at 7, 24.)  He also repeatedly testified that

he paid investors with the funds of other investors.  See, e.g., (Yagalla Dep. I at 8, 42, 43,

56, 137-38; Yagalla Dep II at 308.)  The Collinses point to Yagalla's various stock

transactions as evidence that Yagalla and the entities he controlled paid investors through

"underlying business assets."  (The Collinses Mem. in Opposition to the Receiver's Mot.

Summ. J. ("Collins Mem. in Opp.") at 12.)   Virtually all of the stock Yagalla invested in

was, however, manipulated; any limited amount of income Yagalla received from the

stock transactions was earned through illegal means.  And even if Yagalla made some

legal trades, "[i]t is no answer that some or for that matter all of . . . [Yagalla's] profit

may have come from 'legitimate' trades made by the corporations.  They were not

legitimate.  The money used for the trades came from investors gulled by fraudulent

representations."  Scholes, 56 F.3d at 757.  In other words, any stock transactions were

merely tools and artifices used by Yagalla in furtherance of his Ponzi scheme.

      The Collinses also argue that the Reciver has not shown that Yagalla ran a Ponzi

scheme because there is no admissible evidence that he promised them "large returns for

their investments."  (Collins Mem. in Opp. at 13.)  As an initial matter, the Collins claim

to have invested approximately $6 million with Yagalla from 1997 through 2000.  In

their Counterclaim, they allege that as of September, 2000, the statements provided by

Yagalla showed their investment to be worth approximately $22 million.  According to

the Collinses, then, Yagalla claimed to have made them a net return of 266% on their

investment in 3 years.  Apparently Yagalla indeed promised "large returns."  Even if

Yagalla did not explicitly state that investors would receive large returns, the fact that he

represented large returns in his fictitious statements "was a clear enticement to investors."

In re Manhattan Invs. Fund, 397 B.R. 13.  Indeed, Yagalla testified that he "had given

investors . . . outrageous gains."  (Yagalla Dep. I. at 772.)  In any event, even assuming

Yagalla did not promise or represent high rates of return, this does not mean that he was

not running a Ponzi scheme.  "Case law has revealed that a clever twist on the Ponzi

concept will not remove a fraudulent scheme from the definition of Ponzi."  In re

Norvergence, 405 B.R. at 730.

Finally, the Collinses point to the affidavit of their expert witness, Silverstone,

which states that "the papers submitted by the Receiver in support of the motion for

summary judgment do not support a conclusion of fact that Yagalla did in fact run his

entities as a Ponzi scheme from its inception."  (Silverstone Aff. ¶ 11.)  According to

Silverstone, the only way to determine whether a Ponzi scheme existed is based on

records of "the Yagalla entities, none of which are before this Court."  (Id.)  Silverstone

says he "cannot conclude with a reasonable degree of accounting certainty that at any

point in time, the Yagalla entities were run as a Ponzi scheme."  (Id. ¶ 12.)

The reason the documents Silverstone claims he needs to determine whether

Yagalla was running a Ponzi scheme are not before the Court, however, is because they

do not exist.  As Fleisher, the Receiver's expert, explained, "funds went in one place and

out the other and were transferred around without documentation, without a trail, or

without knowing whose funds they were or why they were being transferred."  (Fleisher

Dep. at 170-71.)  And Fleisher did not confront the difficulties Silverstone allegedly did

in determining whether Yagalla was running a Ponzi scheme.  Fleisher's report states that

Yagalla "was, in fact, operating a "Ponzi scheme", using the funds received from

investors for whatever purpose he chose, including repayments to other investors."

(Report of Stuart Fleisher ("Fleisher Report") at 2, Licker Aff. 9/29/2004, Ex. 38.)

The information brought by the United States Attorney's Office, to which Yagalla

plead guilty, states "YAGALLA repeatedly caused the funds of one client to be used to

pay money to other clients, typically when a client wanted to withdraw money from Apex

or the Hudge Fund [Ashbury]."  (Information at 6-7.); see In re Manhattan Invs. Fund,
379 B.R. at 12 (pleading guilty to operating Ponzi scheme is evidence of existence of
Ponzi scheme).  The complaint filed by the SEC in the SEC Action, which Yagalla did
not contest, states that Yagalla misappropriated funds "to pay for lavish personal
expenses, to repay other investors, and for other improper purposes."  (SEC Action
Complaint ¶ 16.)

Yagalla's testimony that he ran a Ponzi scheme, the fact he pled guilty to conduct
amounting to a Ponzi scheme, that he did not contest the SEC's allegations that he ran a
Ponzi scheme, and Fleisher's conclusion that Yagalla indeed ran a Ponzi scheme, lead to
the inevitable conclusion that Yagalla did, in fact, run a Ponzi scheme and used Ashbury,
ACM and Apex in doing so.  This conclusion is not subject to reasonable dispute.  See In
re Manhattan Invs. Fund, 397 B.R. at 12-13 (finding debtor operated Ponzi scheme
despite disagreement of experts).

Since the Court finds that Yagalla, at all relevant times, operated a Ponzi scheme,
he "necessarily act[ed] with actual intent to defraud creditors."  Terry, 432 F. Supp. 2d at
639.

## B. Insolvency

The Collinses, Romano and Braun argue that the Receiver has not proven that
Yagalla, Apex, Ashbury and ACM were insolvent.  They attack Fleisher's report and say
that he failed to consider various assets Yagalla owned and that his methodology is
flawed in reaching the conclusion that Yagalla and the entities he controlled were
insolvent.  The Collinses again point to Silverstone's affidavit.  Silverstone states that he
cannot determine whether Yagalla, Apex, Ashbury and ACM were insolvent because "to

determine whether the Yagalla entities were in fact a Ponzi scheme and insolvent, the Yagalla entities must be analyzed separately," and the records he needs to undertake such an analysis are not before the Court.  (Silverstone Aff. ¶11.)

These arguments are without substance.  Yagalla ran a Ponzi scheme "[f]rom the very beginning, in 1995."  (Yagalla Dep I at 7, 24.)  He ran the scheme through Apex, Ashbury and ACM.  Yagalla and these entities – his "evil zombies," Scholes, 56 F.3d at 754, in perpetrating the fraud – were, "as a matter of law, insolvent."  Warfield 436 F.3d at 558.  All of the transfers in question where made when Yagalla "was engaged or was about to engage in a business or a transaction for which . . . [his] remaining assets . . . were unreasonably small in relation to the business or transaction," UFTA § 4(a)(2)(i), or "intended to incur, or believed or reasonably should have believed that he. . . would incur, debts beyond his . . . ability to pay as they became due."  Id. § 4(a)(2)(ii).  If reasonably equivalent value was not given in return for the transfers, they are voidable by the Receiver as constructively fraudulent.  See id. § 4(a)(2).

## VI. The Collins Action

## A. The Settlement

In their motion for partial summary judgment, the Collinses ask the Court to enforce the settlement agreement set forth in the Stipulation "so ordered" by Judge Casey on April 21, 2004.  The Collinses argue that even if the Court does not enforce the settlement agreement, the Receiver is equitably estopped from recovering in excess of the $1.65 million settlement amount.

"Settlement agreements are contracts and must therefore be construed according to general principles of contract law."  Torres v. Walker, 356 F.3d 238, 245 (2d Cir.

2004).  The Stipulation provides that it is governed by New York law.  (Stipulation ¶ 9.)
The settlement between the Receiver and the Collinses was conditioned upon the Court
approving and entering a bar order "barring third-parties with notice of the settlement
from pursuing any claim against the Settling Defendants arising out of, concerning, or
related to any investments with Yagalla or his entities."  (Id. ¶ 3.)  The Stipulation states
that "[t]he receiver and the Settling Defendants shall jointly submit a motion to the Court
seeking entry of the Bar Order.  The Settling Defendants shall draft and cooperate with
the Receiver in preparation of the motion . . . ."  (Id. ¶ 4.)

     The submission of a joint motion for a bar order to the Court is a condition
precedent to the parties settlement agreement.  While "[i]t is true that a condition
precedent may be excused if the party whose performance is predicated on that condition
somehow blocks its occurrence," it is equally true "that a condition precedent is not
automatically waived simply because the conditional promisor blocks the condition
precedent."  Cross & Cross Properties, Ltd v. Everett Allied Co., 886 F.2d 497, 501-02
(2d Cir. 1989). The question is whether the party who blocks the condition precedent
acted in the good faith, and "[t]he boundaries set by the duty of good faith are generally
defined by the parties' intent and reasonable expectations in entering the contract."  Id. at
502; see Wang v. Chen, No. 89 Civ. 8319(JSM), 1992 WL 7840, at *3 (S.D.N.Y. Jan. 10,
1992) ("there is an obligation on the part of both parties to a contract to 'attempt in good
faith' to obtain the prerequisites necessary for performing . . . [a] contract." (quoting
Vanadium Corp. v. Fid. & Deposit Co., 159 F.2d 105, 108 (2d Cir. 1947)).  "In
attempting to construe the contracting parties' intent fairly and reasonably . . . [the Court]

must consider (among other things) the specific language of the contract, and the context within which that contract was formed."  Cross & Cross, 886 F.2d. at 502.

Licker (the Receiver's counsel) explained that he did not submit the motion seeking a bar order binding non-parties proposed by Ruvoldt (the Collinses' attorney) because Ruvoldt had failed to supply adequate legal support for the proposition that non-parties could be bound by the settlement.  Implicit in the Stipulation's requirement that the parties "jointly submit a motion" seeking a bar order is a further requirement that both parties be reasonably satisfied that the motion is founded in law.  This is particularly true given Licker's and Ruvoldt's obligations as officers of the Court.  There is no indication that Licker (and hence the Receiver) refused to submit the proposed motion in anything but good faith.  Indeed, Licker's concerns regarding the Court's authority to issue a bar order binding non-parties are justified.  See Fed. Deposit Ins. Corp. v. Geldermann, Inc., 975 F.2d 695, 698 n.4 (10th Cir. 1992) (noting that courts "have uniformly prohibited parties from seeking to preclude the rights of nonparties."); Alvarado Partners, L.P. v. Mehta, 723 F. Supp. 540, 554 (D. Colo. 1989) ("Fundamental due process principles prohibit claim extinguishment against anyone not a party to this action.").  Since no joint motion for a bar order was submitted to the Court, the Stipulation was rendered "void in its entirety."  (Stipulation ¶ 3.)  The Collinses' motion for summary judgment enforcing the settlement agreement is denied.

Invoking the doctrine of equitable estoppel, the Collinses contend that any recovery obtained by the Receiver should be capped at the $1.65 million settlement amount in the Stipulation.  Under New York law, "[t]he elements of estoppel are with respect to the party estopped: (1) conduct which amounts to a false representation or

concealment of material facts; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts.  The party asserting estoppel must show with respect to himself: (1) lack of knowledge of the true facts; (2) reliance upon the conduct of the party estopped; and (3) a prejudicial change in his position."  Smith v. Smith, 830 F.2d 11, 12 (1987) (quoting Airco Alloys Div., Airco Inc. v. Niagara Mohawk Power Corp., 76 A.D.2d 68, 81-82 (N.Y. 1980)).  The Collinses do not satisfy any element of equitable estoppel.  Most importantly, however, the Receiver did not make a single misrepresentation in connection with the settlement.  The Collinses motion for summary judgment seeking to estop the Receiver from recovering in excess of the settlement amount is denied.

**B. Good Faith**

The Collinses argue that the Receiver's fraudulent conveyance claims based on actual fraud should be dismissed because they have proved the defense of good faith. According to the Collinses, they received all transfers from Yagalla in objective good faith.  The Collinses assert that they gave reasonably equivalent value for all transfers they received except for $591,543 because they invested $5,769,380 with Yagalla and withdrew $6,360,923.  In his memorandum in support, the Receiver states that "the amount sought on this motion is $3,501.831."  (Receiver's Collins Action Mem. in Supp. at 15 n.9, 23.)  In his reply and his memorandum in opposition, however, the Receiver asks the Court for a $6,360,923 judgment against the Collinses on an actual fraud theory. In order to void all transfers to the Collinses as actually fraudulent, the Receiver must establish that the Collinses will be unable to prove the good faith defense as to any transfer they received from Yagalla.

There are disputed questions of fact which bear on the question of the Collinses' good faith defense to the actual fraud claims. The questions of fact pertain to the point in time the Collinses were on notice of sufficient facts "to induce a reasonable person to inquire" into the suspicious nature of the transfers they were receiving from Yagalla. In re Cohen, 199 B.R. at 719. The Receiver argues that the Collinses were on notice of Yagalla's machinations in 1998, when Dr. Collins spoke to Morton about Yagalla's failure to pay dividends on cash balances. But after speaking with Yagalla, Morton wrote Dr. Collins stating that Yagalla had "impressed" him. (Letter from Morton to Dr. Collins dated October 28, 1998.) Morton's concern with Yagalla was not fraud, but instead the amount of risk Yagalla was taking. (Id.) The Receiver also contends that the Collinses were on inquiry notice of Yagalla's fraud in early 2000, after they received seven bounced checks. While this may be true, there is a legitimate factual dispute as to when in 2000 the Collinses received the checks. Without citation to record evidence, Balmer states that the seven checks were issued from January 31, 2000 through September 15, 2000. (Balmer Aff. ¶ 8.) According to Mrs. Collins, Yagalla issued a single bad check in April, 2000, and all other checks from Yagalla cleared until September, 2000. (L. Collins Dep. at 129-30.)

The Collinses, on the other hand, argue that they have shown as a matter of undisputed fact that they received all transfers in objective good faith. While the exact date has not been fixed, at some point the Collinses could no longer "safely turn a blind eye" to the mounting evidence that Yagalla was not engaged in legitimate business. In re Cohen, 199 B.R. at 719. In late September, 2000, Yagalla testified that he told the Collinses that he was using investor funds to trade for himself and had "experienced

significant losses." (Yagalla Dep. I at 136.) The Collinses are hard pressed to argue that after learning this they received any future transfers in objective good faith. This does not mean, however, that the Collinses will be unable to prove their good faith defense as to some of the transfers in question. Since the facts relevant to the Collinses' good faith defense are in dispute, the Collinses' motion for summary judgment on the Receiver's actual fraud claims in Counts II and IV of the <u>Collins</u> Complaint, and the Receiver's request for summary judgment voiding all transfers to the Collinses as actually fraudulent, are denied.

## C. Transfers from Ashbury

The Receiver argues that the $3,501,831 in transfers the Collinses received from Ashbury should be voided under either an actual or constructive fraud theory. According to the Receiver, because the Collinses were investors in Apex, they did not provide reasonably equivalent value for any transfers from Ashbury. The argument goes that because the value given by a Ponzi scheme investor is "is a dollar-for-dollar reduction in the investor's restitution claim," <u>In re M&L Bus. Machine</u>, 198 B.R. 810 n.4, the Collinses did not provide value to Ashbury because their restitution claim is against Apex.

Summary judgment cannot be granted to the Receiver based on the transfers from Ashbury for two reasons. First, there is a question of fact regarding the amount of the Collinses' investment that Yagalla transferred from Apex to Ashbury. The Lorraine Collins IRA account was initially opened as an Ashbury account. The Receiver states that the $50,028.32 in the account is excluded from his calculation of the transfers received by the Collinses from Asbury without antecedent value. But while Balmer's

affidavit states that other than the money in the Lorraine Collins IRA Account, "the Collinses did not contribute any money to Ashbury," (Balmer Aff. ¶ 5), Yagalla testified that he transferred $888,857 in Fulton stock owned by Dr. Collins to Ashbury.   (Yagalla Dep. I at 487.)  It is also unclear how Balmer determined with certainty that the Collinses' investment, or at least part thereof, was not transferred to Ashbury in light of Fleisher's testimony that "it is impossible to distinguish between the funds and financial position of Yagalla and those of its affiliates or alter egos" because "funds went in one place and out the other and were transferred around without documentation, without a trail, or without knowing whose funds they were or why they were being transferred." (Fleisher Dep. at 170-71.)

Second, in perpetrating his fraud, Yagalla did not distinguish between Apex, Ashbury and ACM.  Indeed, Fleisher stated in his report that, "Yagalla made no distinction between or among his own personal assets and those received by or for any of the assorted entities or pseudonyms to be invested for his clients.  Similarly, he did not distinguish between or among personal liabilities, business liabilities, and obligations to clients."  (Fleisher Report at 1-2.)  While value provided to third-parties unrelated to the debtor do not suffice to provide the debtor with reasonably equivalent value, "[a] clear distinction from this rule exists, however, if the debtor and the third party are so related or situated that they share an 'identity of interests,' because what benefits one, will in such case, benefit the other to some degree."  Lawrence Paperboard Corp. v. Arlington Trust Co. (In re Lawrence Paperboard Corp.), 76 B.R. 866, 874 (Bankr. D. Mass. 1987) (quoting In re Royal Crown Bottlers of N. Ala., 23 B.R. 28, 30 (Bankr. N.D. Ala. 1982).  Given the close relationship between Apex and Ashbury, a pro-rata reduction in the

Collinses' retribution claim against Apex may well "confer[] an indirect but equally real benefit to . . . [Ashbury]." <u>Nordberg v. Societe Generale (In re Chase & Sandborn Corp.)</u>, 848 F.2d 1196, 1198 n.7 (11th Cir. 1988).[16]

     The Receiver's motion for summary judgment voiding $3,501,831 in transfers the Collinses received from Ashbury is denied.

## D. Transfers in Excess of Investments

     The Receiver asks the Court to void all withdrawals the Collinses made from the Ronald Collins and Lorraine Collins Accounts above of their contributions to the two accounts.  According the Balmer's figures, the Collinses withdrew $3,125,726 in excess of their contributions.  (Balmer Aff. ¶¶ 6-7.)  In calculating the Collinses' "false profits," however, the Receiver does not account for the investments made by the Collinses in their four other Apex accounts.

     The Receiver argues that because the UFTA refers to voiding "a transfer," UFTA § 4(a), the Court should treat each account separately in determining whether the Collinses gave reasonably equivalent value for the transfers they received.  According to the Receiver, he is entitled to void the transfers from the Ronald Collins and Lorraine Collins Accounts (which were net winners) without accounting for the investments made by the Collinses in their other four accounts (which were apparently net losers).  The Receiver offers no relevant support for this approach, and the Court rejects it.

     In determining whether reasonably equivalent value has been provided for a transfer, courts "delve beyond 'form' to the 'substance' of the transaction."  <u>AFI Holding,</u>

---

[16] In marked contrast to his position that Apex and Ashbury should be treated as separate entities in considering the Collinses' restitution claim, in the <u>Romano</u> Action the Receiver argues that since investors in the Yagalla Ponzi scheme "could seek to 'pierce the corporate veil,' each of the subjects of the receivership should, if deconsolidated, carry as a liability <u>each</u> dollar of liability, regardless of whether it is nominally attached to that entity or another."   (Receiver's Reply to Romano's Resp. to Mot Summ. J. at 9.)

Inc., 525 F.3d 700, 708 (9th Cir. 2008); see In re Jordan, 392 B.R. at 443 (same); Wiand, 611 F. Supp. 2d at 1321 ("In assessing whether value was given, the totality of the circumstances are examined . . . ."). The value given by the Collinses was a pro rata reduction in their restitution claim for the total amount of their investment. See Donnell, 533 F.3d at 771. Whether that value is the result of a deposit made by the Collinses in one account as opposed to another is simply irrelevant – the value to Apex is the same – a reduction in the Collinses' restitution claim in the amount invested. As explained in Donnell,

> Amounts transferred by the Ponzi scheme perpetrator to the investor are netted against the initial amounts invested by that individual. If the net is positive, the receiver has established liability, and the court then determines the actual amount of liability, which may or may not be equal to the net gain, depending on factors such as whether transfers were made within the limitations period or whether the investor lacked good faith. If the net is negative, the good faith investor is not liable because payments received in amounts less than the initial investment, being payments against the good faith losing investor's as-yet unsatisfied restitution claim against the Ponzi scheme perpetrator, are not avoidable within the meaning of UFTA.

Id.

The Collinses assert that they received $591,543 in transfers above their total investment. (Ruvoldt Aff. ¶ 5.) The Receiver argues that this figure is inaccurate because it includes monies deposited in the accounts opened for the Collins Children. (Licker Aff. 7/16/09 ¶ 35.) Since the Collinses concede that they received $591,543 in excess of their investment in Apex, the receiver is, as a matter of law, entitled to void that amount as a fraudulent transfer. Whether the transfer is voided under an actual or constructive fraud theory is irrelevant; the Collinses provided no value in return for false profits. Except for this $591,543, the amount deposited in, and withdrawn from, the six

accounts opened for the benefit of the Collinses presents a disputed question of fact for resolution at trial.  The Receiver's motion for summary judgment is granted to the extent of $591,543 and otherwise denied.[17]

## VII. The <u>Braun</u> Action

### A. $126,000 for "Escort" Services

The Receiver seeks to recover the $126,000 Yagalla paid to Braun for seven "escorts" in 1999.  According to the Receiver, all transfers Yagalla made to Braun for escorts are voidable under an actual or constructive fraud theory because the transfers were payment for prostitutes and thus Braun did not provide reasonably equivalent value.  Braun argues that she only received $66,000 from Yagalla for escorts, but that in any event, none of the transfers from Yagalla to her are voidable because she provided reasonably equivalent value by arranging dates for Yagalla.

Illegal consideration does not constitute reasonably equivalent value.  <u>See Liberatore v. 21st Century Commc'ns, Inc. (In re 21st Century Satellite Commc'ns, Inc)</u>, 278 B.R. 577, 582 (Bankr, M.D. Fla. 2002); <u>Wolkowitz v. Soll, Rowe, Price, Raffel & Browne (In Fink)</u>, 217 B.R. 614, 619 (Bankr. C.D. Cal. 1997); <u>Martino v. Edison Worldwide Capital (In re Randy)</u>, 189 B.R. 425, 441 (Bankr. N.D. Ill. 1995 1995); <u>Geary v. Schwen</u>, 124 A. 630, 440-41 (Pa. 1924).  Yagalla testified that when contacted Braun, he believed she was a pimp.  (Yagalla Dep. II at 13-15.)  While Yagalla recounted that

---

[17] The Court's order dated January 31, 2001 temporarily enjoined all claims "affecting or potentially affecting" Yagalla, Ashbury, ACM, Apex and the assets of Yagalla.  (Restated and Amended Order Appointing Receiver and Granting Other Relief § IX.)  The order also provides that the Receiver is immune from liability unless it is shown that he "acted in bad faith or failed to act in a circumstance where the receiver . . . had a legal duty to do so."  (<u>Id.</u> § IV.)  The Receiver moves for summary judgment dismissing the Collinses' Counterclaim to the extent it is asserted against him.  The Collinses clarify that their Counterclaim is asserted against Yagalla, Apex, Ashbury and ACM, and not against the Receiver.  In their motion for partial summary judgment, the Collinses ask the Court to lift the stay of their Counterclaims.  The request is denied.

when he first contacted Braun the two spoke in terms of "fun," he had sex with most of the women Braun arranged for him to meet.  (Id. at 58, 66, 71.)  And over the course of their relationship, Yagalla told Braun about his sexual exploits with the women he hired.  (Id. at 26-27.)  Maxwell, who worked for Braun, explained that she had sex on most of the dates Braun arranged and that she had sex with Yagalla on one of their dates.  (Maxwell Dep. at 35-36.)  Maxwell also testified that Braun spoke with her prior to some dates to determine whether she would be willing to engage in certain "eccentric" or "odd" sexual acts.  (Maxwell Dep. at 36.)  When she was unhappy "about the way some of them [Braun's clients] treated me sexually," Maxwell would tell Braun.  (Id.)

Braun maintains that men pay her upwards of eight thousand dollars per evening for the "companionship" of "[a]ctresses, models, centerfolds and adult film stars." (Braun Dep. at 10,15.)  She says she does not offer sex.  (Id. at 22-23).  As Braun would have it, the Receiver is a prude, relying on "neo-Victorian innuendo" to prove his claim. (Braun's Mem. in Opp. to Mot. Summ. J. at 2.)  Braun's tall tale is preposterous.  It is akin to the madam telling the police she runs a finishing school when her brothel is raided.  Her denial is simply not credible.  Yagalla said he intended to hire prostitutes through Braun and that is what he did.  Maxwell, one of the prostitutes Yagalla retained, explained that Braun knew her employees were having sex with customers and took care to ensure that her customers' sexual desires would be satisfied.  Braun cannot defeat the Receiver's motion for summary judgment by telling false fables and making baseless charges of prudish self-righteousness.  The payments Yagalla made for "escorts" were in fact illegal payments for prostitutes, and as such, Braun did not provide reasonably

equivalent value.  The transfers are therefore voidable under either an actual or constructive fraud theory.

There is a question of fact, however, as to the amount of money Yagalla paid Braun for the dates.  Braun has admitted to receiving $66,000 for four of the seven "escorts" she provided for Yagalla in 1999.  (Braun Admissions ¶¶ 11-13, 16-17, 19.)  The Receiver relies on the testimony of Braun and Yagalla to prove the remaining $60,000 in alleged transfers, but their testimony is inconsistent and fails to clearly establish the amounts of the transfers.  The Receiver's motion for summary judgment voiding the transfers made by Yagalla to Braun for "escorts" is granted.  Judgment will be entered in the amount of $66,000 with the balance of the amount to be determined at trial.  Braun's motion for summary judgment on the Receiver's claims seeking to void the transfers is denied.

**B. $250,000 for "Relationship" with Cousino**

The Receiver contends that the $250,000 payment Yagalla made to Braun for finding him a "girlfriend" is voidable because the agreement between Braun and Yagalla "for" Cousino is contrary to public policy.  The Receiver also argues that since Braun treated the $250,000 payment as a gift for federal income tax purposes, she is estopped from asserting that she provided value in return for the transfer.  Cousino contends that she provided reasonable equivalent value for the $250,000 transfer by essentially acting as a matchmaker for Yagalla and agreeing not to set up dates for Cousino with other men.

The doctrine of quasi-estoppel "forbids a party from accepting the benefit of a transaction or statute and then subsequently taking an inconsistent position to avoid the corresponding obligations or effects."  Davidson v. Davidson (In re Davidson), 947 F.2d

1294, 1297 (5th Cir. 1991); see 31 C.J.S. Estoppel and Waiver § 146 (2009).  "Courts

have regularly found that quasi-estoppel bars a party from adopting a factual position in

court that is contrary to a position previously taken on a tax return."  Am. Mfrs. Mut. Ins.

Co. v. Payton Lane Nursing Home, Inc.  __ F. Supp. 2d __, No. CV 05-5155(AKT), 2010

WL 417403, at *14 (E.D.N.Y. Jan. 27, 2010) (collecting cases); see Amtrust, Inc. v.

Larson, 388 F. 3d 549, 601 (8th Cir. 2004) ("'Quasi-estoppel' has been invoked by

various courts to estop parties from asserting a position in judicial proceedings different

than what was reported on their income tax returns."); Ginor v. Landsberg, 159 F.3d 1346

(2d Cir. 1998) (unpublished table decision) (party estopped from taking position

inconsistent with representation to IRS); Robb-Fulton v. Robb (In re Robb), 23 F.3d 895,

898 (4th Cir. 1994) (where debtors claim payments as alimony on tax return "doctrine of

quasi-estoppel precludes [the] debtors from subsequently claiming in bankruptcy

proceedings that these payments were something other than alimony."); In re Davidson,

947 F.2d at 1297 (quasi-estoppel precludes litigation position inconsistent with tax return

to prevent "a legal affront to both the bankruptcy and tax codes."); Meyer v. Ins. Co. of

Am, No. 97 Civ. 4678(AJP), 1998 WL 709854, at *10 (S.D.N.Y. 1998) (plaintiff bound

by "sworn representation in her tax return" and "estopped from not taking a position

inconsistent with  . . . representations to the IRS.").

Braun admits that she claimed the $250,000 she received from Yagalla as a non-

taxable gift on her federal income tax return.  (Braun Admissions ¶¶ 31-33.); see 26

I.R.C. § 102(a).  She points out that it was Yagalla's idea to provide the Gift Letter.  This

is irrelevant.  Braun claimed the $250,000 as a gift on her tax return and so she is

estopped from taking the position that the money was anything other than a gift.  As such,

there is no genuine issue of material fact as to whether Yagalla received reasonably equivalent value for the $250,000 he paid to Braun through two transfers in August and September, 1999.  He did not.  The transfers are voidable as either actually or constructively fraudulent.  The Receiver's motion for summary judgment is granted in the amount of $250,000.

## C. Other Transfers

Braun moves for summary judgment on the Receiver's fraudulent transfer claims based on the $180,000 to $360,000 sent by Yagalla to Braun through nine Federal Express shipments and the 10,000 shares of Intelliworxx stock.  She argues that there is no evidence that these transfers occurred.

Yagalla testified that he sent Braun between $180,000 and $360,000 in cash and checks through nine Federal Express shipments between March, 1999 and April, 2000.  (Yagalla Dep. II at 116, 121-23.)  And the Receiver has submitted evidence showing nine Federal Express shipments from Yagalla to Braun.  (Federal Express Documents.)  Yagalla also testified that in some point in 1999, he transferred 10,000 shares of Intelliworxx stock to Braun.  (Yagalla Dep. II at 77.)  And on June 10, 1999, Yagalla faxed his brokers instructions to transfer 10,000 shares of Intelliworxx to Braun.  (Fax Cover Sheet.)  There is, therefore, evidence of the transfers the Receiver seeks to void.  Braun's motion for summary judgment on the Receiver's fraudulent transfer claims based on Yagalla's transfer of $180,000 to $360,000 in cash and checks and 10,000 shares of Intelliworxx stock is denied.

## D. Breach of Contract and Fiduciary Duty

Braun moves for summary judgment on the Receiver's breach of contract and breach of fiduciary duty claims. The claims are based on Braun and Yagalla's agreement to create and run the Nici's World website. Regarding the breach of contract claim, Braun argues that there is no evidence she breached her oral agreement with Yagalla. The terms of the oral agreement between Braun and Yagalla are, however, disputed. For instance, Yagalla testified that he agreed to invest $50,000 to get Nici's World "up and running." (Yagalla Dep. II at 94-95.) Braun, on the other hand, says that Yagalla agreed to invest $150,000. (Braun Dep. at 183, 186.) Since the terms of the oral agreement are disputed, it cannot be determined as a matter of law whether Braun breached the agreement and summary judgment is inappropriate.

As the managing member of NEG, Braun owed Yagalla a fiduciary duty of loyalty and care. See Kelly v. Blum, No. 4516-VCP, 2010 WL 629850, at *10 (Del. Ch. Feb. 24, 2010). Despite Braun's assertion to the contrary, there is evidence in support of the Reciever's claim that Braun breached her fiduciary duty to Yagalla. For instance, Yagalla testified that Braun failed to comply with his request for an accounting. (Yagalla Dep. II at 105-06.) And whether Braun breached her fiduciary duty to Yagalla turns, in part, on whether she complied with her obligations under the oral agreement, the terms of which are in dispute. Braun's motion for summary judgment on the Receiver's breach of contract and breach of fiduciary duty claims is denied.

## VIII. The Romano Action

### A. Receiver's Right to Sue

Romano argues that the Receiver's fraudulent transfer claims are asserted on behalf of Yagalla's investors, and because the Receiver was not appointed to act on

behalf of the investors, the claims must be dismissed for lack of standing.  As the style of the <u>Romano</u> Amended Complaint clearly indicates, the Receiver brings suit on behalf of the entities in receivership.  These entities are UFTA creditors.  <u>See</u> <u>Donnell</u>, 533 F.3d at 777; <u>Scholes</u>, 56 F.3d at 754.  The Reciver has standing to assert fraudulent transfer claims against Romano.

**B. $180,000 Transfer**

The Receiver moves for summary judgment voiding the $180,000 payment Yagalla made to Romano for his participation in the TravelNow stock manipulation scheme.  Since illegal consideration does not constitute reasonably equivalent value, the Receiver contends that the transfer is voidable as actually or constructively fraudulent.

Yagalla testified that Romano agreed to participate in the TravelNow stock manipulation and that the $180,000 was payment for Romano finding buyers for $1 million worth of TravelNow stock.  (Yagalla Dep. III at 270-72, 291, 312-13.)  Romano argues that since the check stub for the $180,000 check Yagalla sent to him states "consulting fees," there is a question of fact as to whether he participated in manipulating TravelNow stock.  Yagalla, however, testified that the Romano told him to write "consulting fees" on the check, presumably to disguise their criminal conduct.  (Yagalla Dep. II at 294.)

Romano argues that the Court should not credit Yagalla's testimony regarding the TravelNow stock manipulation since trading data for TravelNow stock is inconsistent with Yagalla's testimony.  Yagalla was, however, speaking from memory when he discussed his and Romano's scheme to manipulate the stock.  His imperfect recollection of the daily trading volume of TravelNow stock does not raise a genuine issue of material

fact.  And whether or not Yagalla actually controlled the market for TravelNow stock is of little moment; what matters is that Yagalla testified that he and Romano conspired to manipulate the stock and that the $180,000 was payment for Romano's agreement to engage in illegal conduct.

During his deposition, Romano did not contest any of Yagalla's testimony. Instead, he invoked his Fifth Amendment privilege against self-incrimination.  The Receiver asks the Court to draw an adverse inference against Romano; Romano contends that there is no authority for drawing an adverse inference at the summary judgment stage.  In this Circuit, courts have held both that an adverse inference should not be drawn, or may be drawn, against a party asserting their Fifth Amendment privilege in the context of a motion for summary judgment.  See Banard v. Joffe (In re Inflight Newspapers, Inc.), __ B.R. __, No. 801-71796-reg., 2010 WL 104594, at 8-9 (Bankr. E.D.N.Y. Jan. 6, 2010) (collecting cases).

On the facts and circumstances here, the Court finds that it is appropriate to draw an adverse inference against Romano.  As Judge Pauley recently explained, "[a] court may draw an adverse inference against a party who asserts his Fifth Amendment privilege in a civil matter, because the invocation of the privilege results in a disadvantage to opposing parties by keeping them from obtaining information they could otherwise get."  SEC v. Susman, __ F. Supp. 2d. __, No. 07 Civ. 6625(WHP), 2010 WL 532060, at *5 (S.D.N.Y. Feb. 11, 2010) (internal citation omitted); see also Commodity Futures Trading Comm'n v. Int'l Fin. Servs., 323 F. Supp. 2d 482, 505 (S.D.N.Y. 2004) ("because Robinson [defendant] asserted his Fifth Amendment privilege . . . at his

deposition, in evaluating the Commision's [plaintiff] evidence, the court may draw an adverse inferences from his silence.").

While an adverse inference may be drawn on a motion for summary judgment, summary judgment cannot "be granted on an adverse inference alone; rather, the inference must be weighed with the other evidence in the matter in determining whether genuine issues of material fact exist." Susman, 2010 WL 532060, at *6. An adverse inference may, however, "be given significant weight because silence when one would be expected to speak is a powerful persuader." LiButti v. United States, 178 F.3d 114, 120 (2d Cir. 1999).

Yagalla's testimony in conjunction with Romano's invocation of his Fifth Amendment privilege establish beyond any reasonable dispute that the $180,000 transfer was payment for Romano's participation in the TravelNow stock manipulation. Romano, therefore, did not provide reasonably equivalent value for the transfer and so the transfer is voidable. The Receiver's motion for summary judgment is granted for $180,000.

## C. $91,963 Transfer

The Receiver seeks to recover $91,963 allegedly transferred by Yagalla to Quattrochi and then to Romano. While the Receiver's theory of recovery is not explained in great detail, it appears the Receiver contends that the $91,963 was payment for Romano arranging Quattrochi's assistance in manipulating TravelNow stock. Yagalla, however, never testified that he transferred $91,963 to Romano or that he paid Romano anything in connection with the Quattrochi. The Receiver's sole support for the claim is Quattrochi's and LPC Capital's bank records. But the records do not prove as matter of undisputed fact that the $91,963 transferred from LPC Capital to Romano came

from the $1 million loan Yagalla made to Quattrochi. While Romano invoked his Fifth

Amendment privilege when asked about the $91,963 check he received from LPC

Capital, this does not remedy the lack of support for the Receiver's claim. Susman, 2010

WL 532060, at *6. The Receiver's motion for summary judgment voiding the $91,963

transfer allegedly made by Yagalla to Romano is denied.

## CONCLUSION

For the forgoing reasons, the Receiver's motion for partial summary judgment in

the Collins Action is GRANTED to the extent of $591,543 and otherwise DENIED. The

Collinses' motion for partial summary judgment is DENIED. The Receiver's motion for

partial summary judgment in the Braun Action is GRANTED to the extent of $316,000

and otherwise DENIED. Braun's motion for summary judgment is DENIED. The

Receiver's motion for partial summary judgment in the Romano Action is GRANTED to

the extent of $180,000 and otherwise DENIED. The Clerk is directed to close the

motions at Docket # 50 and 56 in 01 Civ. 2437; Docket # 15 in 02 Civ. 2796; and Docket

# 19 and 26 in 02 Civ. 3620.

Dated: New York, New York
       March 2⅄, 2010

SO ORDERED

PAUL A. CROTTY
United States District Judge

**Copies   mailed By Chambers**